PEGRAM *v.* STATE.

No. 39465        February 28, 1955        78 So. 2d 153

*B. H. Loving,* West Point, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

Lee, J.

Bill Pegram was convicted of the offense of armed robbery, and from a sentence of twenty-five years in the State Penitentiary, he appealed.

About one o'clock on the morning of June 2, 1953, Andy Rimmer, a colored man, in charge of a beer joint in Clay County, was awakened from his slumber, and as he partly opened the door, two men forced their way inside at the point of a gun. They placed adhesive tape over his eyes and mouth and securely bound him. A

truck was then backed up to the door, and approximately 205 cases of beer from the joint were loaded thereon. Two or three persons carried it to the truck and another stacked it. Besides, the cash register was ransacked, and Rimmer's .38 Smith and Wesson pistol and $23 from his trousers were taken. When Beady Thorpe drove up for the purpose of getting a bottle of beer, he saw the truck in question with a green tarpaulin lying on the cab. A man on the outside pointed a shotgun at Thorpe and ordered him to "get out." As he drove away, he heard a gunshot. Neither he nor Rimmer could identify any of the robbers.

Sometime that morning, a recently fired shotgun shell was picked up about fifteen feet from the front door. On June 19, 1953, officers stopped a car in which Bob Ballew, Mack Woods, Earnest Rose and Walter B. Scott were riding, as it was speeding through a thirty mile zone. Rimmer's pistol and other weapons were found in the search of the car; and later that day, an automatic shotgun was taken from the apartment of Rose. The shell and shotgun were forwarded by the sheriff to the Federal Bureau of Investigation laboratory at Washington, D. C., and a firearms expert testified that the shell was fired from this particular shotgun.

Earnest Rose testified for the State that he met Bill Pegram Saturday afternoon May 30th when Scott brought him to the tourist court in Columbus where Rose was living; that, at the time, he, Scott, Pegram and another were going to rob Sol Martin at the intersection at Booneville; that, during the afternoon, they planned the robbery of the beer joint here involved; and that they separated about four or five o'clock, and that Pegram went to Memphis, where he lived. He, Ballew, Scott and Pegram got together at Green's Garage at Columbus between eleven and twelve o'clock the following Monday night, and went to the beer joint. Pegram and Scott were in a 1950 model one-ton truck, and he and Ballew

were in a 1950 model Ford car. He and Ballew went inside because they were unknown to Rimmer, while Pegram and Scott stayed on the outside because he knew them. After taping and binding Rimmer, Rose drove the car up to the side door, and Pegram drove the truck to the front door. All of them participated in loading the beer into the truck. While this was being done, someone in a car drove up to the front door. Pegram grabbed the shotgun, ordered him to leave, and fired a shot. The quartet drove a considerable distance to the home of a cousin of Scott, where they stored the truck and the beer, and returned to Columbus in the automobile just before daylight. He also explained how the beer was disposed of and the distribution of the spoils.

It was shown that one Bill Wilson, in Tupelo, on the following Saturday, sent $300 to Scott at Columbus by Express Money Order. Rose testified that he knew Pegram also as Bill Wilson, and that Pegram had promised to wire the money. However, the agent of the Express Company at Tupelo did not undertake to identify Bill Wilson, the sender, as Bill Pegram, the defendant.

The identity of Pegram, as one of the participants in the robbery, rested solely on the testimony of Rose, who admitted that he had been convicted of a number of crimes, beginning when he was only fifteen years of age, and that he had been out of the penitentiary or jail only two years since he became fifteen years old.

The defendant did not testify. His defense was an alibi. Witnesses testified that he was in Green's Garage on Saturday until he left for Tupelo, by automobile, sometime shortly after noon; that he and his companions arrived at Tupelo about three-thirty o'clock where he remained until he took a plane flight to Memphis at 8:01 that evening, reaching his destination about nine o'clock; that he was at home with his wife and daughter the next day and night; that he had a conference for about thirty minutes on Monday with a Special Agent of the Federal

Bureau of Investigation in his office between twelve and one o'clock; that he was with his wife, daughter and Taft Moody for supper and a social engagement and in attendance upon a show, from seven-thirty or eight o'clock until eleven-thirty or twelve o'clock that night; that he spent the rest of the night at home; that he had another engagement with the Special Agent in his office the next morning at ten o'clock, and the conference lasted about one and one-half hours; that he talked from Memphis over long distance telephone to J. W. Riley on Monday, and informed him that he would not return to Columbus until Tuesday afternoon; that he flew by plane from Memphis at 1 P. M. Tuesday, and arrived at Columbus at 2:04 that afternoon. The records of the air line verified that Pegram was a passenger on the above named flights. It is 168 miles from Columbus via Aberdeen to Memphis, and 178 miles between the two points via West Point.

The statements of the witnesses for the appellant were clear cut and without vacillation or equivocation. If they were true, obviously Pegram could not have been a participant in the robbery.

When Earnest Rose, on direct examination, was asked by the district attorney where he first got acquainted with Pegram, the record shows his answer, objections thereto, and the court's action thereon as follows: "Well, sir, we were going to Booneville to rob that fellow over there at the intersection, Sol Martin. Q. I didn't ask you that and we move it be stricken from the record as—— MR. LOVING: That is a pertinent attempt to prejudice this man and give him an unfair trial in this court. I wish the witness to be instructed to confine the issues in this case. THE COURT: I don't know about that. MR. LOVING: We move that answer be stricken and the jury be directed to disregard it altogether. THE COURT: Objection overruled."

Again, when Rose was under cross-examination, counsel asked how long Pegram stayed with the witness and Scott, and the record discloses his answer, objections thereto, and the court's action thereon as follows: "He was with us for most of the afternoon. We went to Booneville and robbed that beer joint over there and we come back and Bill went on to Memphis I believe. MR. LOVING: We object to the statement that the witness made about another alleged crime and move that it be stricken from the record and the jury instructed to disregard it, an attempt to prejudice this jury. THE COURT: Overruled. You asked the question. MR. GUINN: I didn't ask that. I asked him where he went. THE COURT: That is what you asked him and he told you."

On another occasion, the witness injected the alleged Booneville robbery into the case, but no exception was taken. Obviously the harm, if any, had already occurred.

. On another occasion, Rose was explaining why Pegram and Scott did not go inside the beer joint at first, and the record discloses his answer, objections thereto, and the court's action thereon as follows: "You see Bill and Scott both had delivered whiskey to Mr. Farr and they had been in cases before. MR. LOVING: We object because it is strictly not responsive to the question. THE COURT: Overruled. He asked the question. A. Walter had made deliveries and was pretty certain this man Mr. Farr might suspect one of them. Walter has got a pretty bad reputation and Bill (Pegram) has too. MR. GUINN: We move the Court to discharge the jury and declare a mistrial. THE COURT: Overruled."

It was error, in the first instance, to admit evidence of previous crimes. This evidence did not fall within the exceptions which were recognized in Floyd v. State, 166 Miss. 15, 148 So. 226, such as " * * * where the offense charged and that offered to be proved are so connected as to constitute but one transaction, or

where it is necessary to identify the offender, or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge and the like, * * *." Cf. Nelson v. State, 129 Miss. 288, 92 So. 66.

Besides such evidence was very prejudicial. Brooks v. State, 209 Miss. 150, 46 So. 2d 94. It is elemental that the State cannot show the general reputation of an accused, unless he first opens up his reputation.

When the State first rested, the record discloses that the trial judge made the following oral charge to the jury: "THE COURT: Gentlemen of the Jury, I want to make this observation in reference to this case. During the trial of the case there has been some reference to other offenses which have been committed by this man along with others. In the consideration of this case you are only trying for this robbery out here. Disregard those things."

As already stated, Pegram's guilt of another robbery, of violating the liquor laws, and his bad reputation, had been injected into the record, and the language of the oral charge assumed that he was guilty of those offenses. Instructions to the jury, whether oral or written, must never assume the guilt of the defendant. Hemphill v. State, 222 Miss. 516, 76 So. 2d 512, and authorities there cited.

The judge was evidently endeavoring to minimize the effect of the objectionable evidence, which, on reflection, he deemed inadmissible. Doubtless the language did not express his real purpose. But this Court cannot "stop to inquire whether the jury was actually influenced * * *." Collins v. State, 99 Miss. 47, 54 So. 666.

A requested instruction for the defendant, which admonished the jury against speculation, conjecture or guesswork, in the exact language of Section 1959, Alexander's Mississippi Jury Instructions, was particularly applicable in this case, and should have been given.

A requested instruction for the defendant to the effect that, in considering the testimony of an accomplice, the jury is to weigh it with great care, caution, suspicion and distrust, in the exact language of an instruction which was granted in Nichols v. State, 174 Miss. 271, 164 So. 20, should have been given. See also Cole v. State, 217 Miss. 779, 65 So. 2d 262.

For the above enumerated errors, it follows that this cause must be reversed and remanded for a new trial.

Reversed and remanded.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.