636 So.2d 1229 (1994)
Scotti Lee HADDOX, a/k/a Scottie Lee Haddox, and Terry Lee Powell
v.
STATE of Mississippi.
No. 91-KA-00652.
Supreme Court of Mississippi.
April 7, 1994.
As Modified on Denial of Rehearing June 16, 1994.
*1231 Jim Kitchens, Kitchens & Ellis, Jackson, Connie Johnson, Morgan City, LA, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and BANKS, JJ.
SULLIVAN, Justice, for the Court:
Scotti Lee Haddox and Terry Lee Powell, sisters, were charged with possession of over one kilogram of marijuana and intent to transfer or sell. They were both found guilty of the lesser offense of possession of over one kilogram of marijuana. They moved for a judgment notwithstanding the verdict and in the alternative a new trial. They appeal, assigning the following five errors.
I. ALL EVIDENCE DERIVED FROM THE UNLAWFUL PURSUIT AND DETENTION OF THE DEFENDANTS SHOULD HAVE BEEN SUPPRESSED;
II. THE DEFENDANTS WERE ENTITLED TO A MISTRIAL WHEN THE STATE ELICITED TESTIMONY FROM THE WITNESS SHERIFF McKENZIE PREVIOUSLY EXCLUDED BY ORDER OF THE COURT;
III. EVIDENCE RELATING TO HANDGUNS AND CASH FOUND ON THE DEFENDANTS, AND OPINION TESTIMONY REGARDING SAME, WERE IMPROPERLY ALLOWED;
IV. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON CERTAIN LESSER INCLUDED OFFENSES; and
V. THE COURT ERRED IN GRANTING STATE'S INSTRUCTIONS S-4A, S-4B AND S-5.

FACTS
Scotti Lee Haddox (Scotti) and Terry Lee Powell (Terry) are sisters. On January 15, 1991, the date of the alleged crime, they were age 21 and 20 respectively. At that time, Terry was pregnant. Scotti and Terry were traveling from Houston, Texas, to Marion County, Mississippi, in their car.
Deputy Bill Vasillion received a few phone calls from a confidential informant on January 15, 1991, informing him that Scotti and Terry were to be on their way from Texas to Marion County with a large amount of marijuana. The caller gave Deputy Vasillion the make, color, and license number of the expected car. The informant was well-known to Vasillion, and Vasillion said that the informant had given him reliable information in the past, though no arrests had before been made on the basis of that informant's information. Vasillion also testified that he had investigated Scotti and Terry before.
Deputy Vasillion and Officer Bennett drove to the Marion County line on Highway 98, and waited until they saw a car matching the informant's description. They followed the car, and notified Sheriff McKenzie. Vasillion checked the ownership of the car through NCIC, and noticed that two females were in the car. He testified that they would know Scotti and Terry by sight, having seen them before. He also confirmed that the make, color, and license number matched the informant's description. The cars left the highway and were on Kokomo-New Hope Road, when Vasillion put on his blue lights. Scotti and Terry pulled over, Terry was driving. The officers asked consent to search the car, but Scotti refused. Vasillion, looking in with his flashlight, did not see any indication of contraband in the car at that time, and told Scotti and Terry that they would have to wait there while a search warrant was obtained, but he did not formally arrest them. Vasillion testified that at that time he believed that he did not yet have the authority to search the car without a warrant. Scotti said they waited about ten minutes. Vasillion said it was about five minutes.
What ended their wait was an attempt to leave the scene. As Vasillion went to his car to make a radio call, Terry got into their car and began to drive off. Scotti grabbed the bumper of Vasillion's police car to prevent him from chasing Terry. She held on to the bumper with her body under the car. Scotti stated she was afraid that if he chased Terry, *1232 who was pregnant, Terry might have a wreck. Another deputy car arrived and pursued Terry. Meanwhile, Deputy Vasillion physically removed Scotti from under his car once, but she immediately broke free and grabbed the bumper and resumed the same position. He then successfully removed Scotti from under his police car, and placed her under arrest and handcuffed her.
While driving away, Terry had been reaching for a large garbage bag in the backseat when she lost control of the car and came to a stop in a ditch beside the shoulder of the road. Terry testified that as she was driving, she found a foreign bag among her packages in the back seat, grabbed it, and threw it out of the car window. That supposedly caused the wreck.
The pursuing officer testified that Terry was standing outside the car when she threw the large black garbage bag. The garbage bag, burst open, contained a green leafy substance, later identified by the crime lab as marijuana. When the officers retrieved the bag, Terry was placed under arrest. Officer Vasillion, along with other deputies, arrived at the scene of Terry's wreck, with Scotti in the backseat of the deputy car.
The officers recovered 7.7 kg of marijuana contained within the garbage bag, which had landed in the grass beside the road. A portion of the bag's contents had spilled out onto the grassy area beside the shoulder of the road. The officers gathered much of the spilled marijuana, but burned what they could not pick up. In the sisters' car, the officers found two handguns and about $3000.00 in cash.
This incident occurred between 10:30 and 11:00 PM on January 15, 1991. The informant had called the sheriff's office at about 8:00 PM and earlier that day.
Scotti and Terry moved to suppress the marijuana and any evidence stemming from the pursuit and detainment. The court denied their motion to suppress. The judge stated that the officers had the right to make an investigative stop and to detain Scotti and Terry, and that at that time, they had probable cause sufficient for a magistrate to have issued a search warrant. At trial, the confiscated 7.7 kg of marijuana and photographs of the guns and money were admitted into evidence through testimony.
A motion in limine to exclude references to the marijuana which had been burned was granted. The purpose of the exclusionary order was to prevent the jury from speculating that there were piles of marijuana involved, over and above the 7.7 kg introduced at trial.
At trial one of the assistant district attorneys was ignorant of this pre-trial order, and began to question Sheriff McKenzie about the extra marijuana. McKenzie testified that they were not able to pick up all the marijuana, at which point the defense objected. In response to the defense motion for mistrial, the judge said, "Yes, sir, you've got one." However, the judge sent the jury out, and upon listening to Matty Jo Fox, the court reporter, read what had been said, the judge concluded that no harm had been done. He further asked the sheriff if he could testify under his oath that whatever was left on the ground and burned was a miniscule amount. The sheriff responded yes. The judge then withdrew his earlier mistrial ruling, concluding that any potential violation of the pre-trial order would be cured by the sheriff testifying that what was left on the ground and burned was an insubstantial amount. He determined that this would in no way violate the purpose of the pre-trial order. The sheriff so testified when the jury returned.
Deputy Vasillion, upon identifying photographs of some $2700 in cash and guns found, stated that based on his past experience in drug-related cases, weapons and money were typically associated with controlled substances crimes. The defense objected to the evidence of the money and guns, and also to Vasillion's opinion about them.
The trial court rejected the defense' request for lesser included offense instructions on the crimes of possession of less than 1 kg and possession of less than 1 ounce of marijuana.
The defense objected also to jury instructions S-4 A & B, and instruction S-5.
The Court instructs the jury that to constitute "possession" as used in the Court's instructions in this case, with respect to *1233 the defendant Terry Lee Powell, it is not necessary that the state prove actual physical possession of the marijuana by her; it is sufficient if the state proves to you beyond a reasonable doubt that the marijuana was subject to her dominion and control and that she was aware of its presence and character. Further the Court instructs you that the marijuana may be constructively possessed by Terry Lee Powell acting either alone or with one or more other individuals jointly.
S-4A.
Instruction S-4B was identical except that Scotti Lee Haddox's name was substituted.
Scotti and Terry also objected to state's instruction S-5. They argued that it was an improper comment on their earlier testimony that they did not expect to profit financially from their actions.
The Court instructs the jury that it is immaterial to the guilt or innocence of the Defendants that they personally did not pay for the marijuana when they obtained it or that they did not intend to receive payment for it at the time they were to deliver the marijuana.
S-5.
The other jury instructions included explanation of the state's burden of proof, and that the jury must give the defendant the benefit of any reasonable doubt. They were instructed that conviction required, among other things, that the defendants possessed "a substance known by them to be marijuana."
The jury returned a verdict of guilty of possession of over one kilogram of marijuana, but without the intent to transfer, against both Scotti and Terry. They were both sentenced to ten years in the custody of the Mississippi Department of Corrections.

LAW

I.

WHETHER ALL EVIDENCE DERIVED FROM THE DETENTION OF THE DEFENDANTS FOR THE PURPOSE OF OBTAINING A SEARCH WARRANT SHOULD HAVE BEEN SUPPRESSED.
The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution contain almost identical language expressing the people's right to be secure from unreasonable searches or seizures.
In order for an officer to have legal authority for an investigative stop, he need not have probable cause to make an arrest. He need only have a reasonable suspicion that the accused is involved in a felony. Floyd v. State, 500 So.2d 989, 993 (Miss. 1986).
Terry v. State, 252 Miss. 479, 173 So.2d 889 (1965), involved a pursuit and pullover by a police car. The court stated that the search begins when the pursuit to make the arrest begins. "An arrest begins when an officer begins his pursuit for the purpose of making an arrest." Smith v. State, 240 Miss. 738, 128 So.2d 857 (1961). Here, the pursuit at issue was not initiated for the purpose of making an arrest, but to make an investigative stop. Therefore, it is readily apparent, based on his confirmation of much of the informant's story, that Deputy Vasillion had the authority to make an investigative stop. Floyd v. State, 500 So.2d 989, 992 (Miss. 1986).
The issue of first impression is whether Deputy Vasillion had the authority to detain Scotti and Terry for the purpose of obtaining a search warrant. Scotti and Terry argue that the officers did not have probable cause to detain them for the purpose of obtaining a warrant: the detention amounted to an arrest, for which probable cause did not exist at that time. If the detention was an unlawful exercise of the officer's authority, and since the evidence of marijuana, guns, and money was derived from that detention, as fruit of the poisonous tree, it must be suppressed. See Rooks v. State, 529 So.2d 546, 551 (Miss. 1988); Pollard v. State, 233 So.2d 792 (Miss. 1970) (defendant's acts in resisting unlawful arrest held inadmissible).
"An arrest is not consummated until there has been a taking of possession of a person by manual caption, or submission on demand; *1234 and although a manual touching is unnecessary unless there is resistance to an arrest, there must be restraint of a person to establish an arrest." Fondren v. State, 253 Miss. 241, 175 So.2d 628 (1965), quoted in Bayse v. State, 420 So.2d 1050, 1053 (Miss. 1982).
Smith v. State, 229 So.2d 551 (Miss. 1970) states:
An arrest within the meaning of the criminal law is the taking into custody of another person by an officer or a private person for the purpose of holding him to answer an alleged or suspected crime.
229 So.2d at 556.
Other cases hold that a person is effectively under arrest when he or she is not free to leave. Magee v. State, 542 So.2d 228, 233 (Miss. 1989). But in Estes v. State, 533 So.2d 437 (Miss. 1988), the court concluded that a suspect placed in the backseat of a police car was not necessarily under arrest, because of the circumstances. Cole, the suspect argued that formal words need not be present to constitute an arrest when it can be shown by the circumstances. Estes, 533 So.2d at 441, citing Reed v. State, 199 So.2d 803 (Miss. 1967). The Estes court responded that the police had asked Cole to get into the car without ordering him to do so, and that he voluntarily did so. The Court further reaffirmed the principle that an officer may stop and detain a person in reasonable circumstances in order to resolve an ambiguous situation without having probable cause to arrest. Estes, 533 So.2d at 441. It must be recognized that during certain investigative stops, the detainee is not free to leave, and thus is temporarily arrested; however, he cannot be said to be "under arrest," in the more permanent sense of the term.
In Floyd v. State, 500 So.2d 989, 992 (Miss. 1986), this Court stated that officers had the authority to detain a person without actually arresting him for investigatory purposes. Floyd, 500 So.2d at 992, citing McCray v. State, 486 So.2d 1247 (Miss. 1986).
McCray held that a brief detention of one's luggage to be sniffed by a dog fell within the scope of an investigative stop. McCray, 486 So.2d at 1250, citing United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
Vehicles also may be the subject of an investigative stop. Floyd, 500 So.2d at 992, citing United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
An investigative stop is permissible even where no probable cause to arrest is present, but the officers must have some objective manifestation or reasonable suspicion grounded in articulable facts that the detainee was involved in a felony.
However, the scope of an investigative stop must be limited, and where officers go beyond this scope, the detention tends toward an actual arrest, or seizure requiring the probable cause for arrest. Floyd, 500 So.2d at 992.
We need not delineate our view of the dividing line between detention and arrest, for as a practical matter it is clear Floyd was arrested, at the latest, when Trooper Graddy handcuffed him. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
Floyd, 500 So.2d at 992.
Applying these cases to the instant case, we find that the defendants Haddox and Powell were not free to leave the scene, as they were told that they would have to wait on a search warrant to search their car.
Officers may make arrests without warrants in certain situations, such as where a felony is committed in their presence. See Pollard v. State, 233 So.2d 792, 793 (Miss. 1970). Because the officers here had not witnessed any evidence of marijuana at the time of the detainment, it is not clear that they had probable cause to arrest. Nevertheless, probable cause to arrest was not required for the limited detainment which occurred in the instant case, because it did not amount to a full arrest.
In Bevill v. State, 556 So.2d 699, 712 (Miss. 1990), the Mississippi Supreme Court *1235 defined probable cause to search as "facts and circumstances within an officer's knowledge, or of which he has reasonable trustworthy information, are sufficient within themselves to justify a man of average caution in the belief that a crime has been committed... ." Bevill, 556 So.2d at 712. But probable cause is less than evidence necessary for condemnation. Id.
The test for probable cause in Mississippi is the "totality of the circumstances test" of Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "We have followed Gates consistently at least since 1983." Williams v. State, 583 So.2d 620, 622 (Miss. 1991). The old Aguillar  Spenelli test for judging probable cause was abandoned and replaced by Gates. Id. at 623. The probable cause inquiry is an objective and practical one; the information presented to the magistrate must be such that would lead him or her to reasonably believe that evidence will be found. Id. at 622. The Williams opinion affirmed a magistrate's finding of probable cause, objectively supported by detailed and lengthy affidavits, including statements by the officers that they had personally observed marijuana in the house to be searched. Id. at 622-623.
Rooks v. State, 529 So.2d 546 (Miss. 1988), involved an observer's information about two white males. The observer saw the two men in a car, and noticed them make a complete turn-around on an airport apron. The car stopped, and one of the two men got out, looked around, walked to a grassy area, retrieved two black garbage bags, carried them to the car, and placed them in the trunk. Based on the observer's information, the sheriff's department had a deputy stop the car and detain the two men until the sheriff could arrive at the scene of the pullover. Id. at 552.
Deputy Farmer stopped the car, viewed the men's identification, and requested consent to search. They refused to consent. Farmer smelled marijuana about one of the men, Rooks, who made a forward step toward Deputy Farmer. Because of this, and his recent back surgery, Deputy Farmer arrested the two men. Upon the sheriff's arrival with a search warrant, the officers retrieved the black garbage bags containing marijuana. Id. at 552.
This Court was faced with the issue of whether the search warrant was supported by probable cause, and concluded that probable cause did exist to stop and search the car. 529 So.2d at 555. This Court discussed in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the "totality of the circumstances" test for probable cause. The Mississippi Supreme Court stated that it had adhered to this test also. This Court stated that probable cause to search was "information reasonably leading an officer to believe that then and there contraband or evidence material to a criminal investigation would be found." Rooks, 529 So.2d at 555.
It is noteworthy that at one point in Rooks, Justice Hawkins, writing for the Court, stated:
Montee and Rooks do not question the authority of law enforcement officers  when they do in fact have probable cause to do so  to stop a motor vehicle and search it, or as in this case, stop and detain the vehicle until a search warrant can be issued by a magistrate.
Rooks, 529 So.2d at 552.
Chapman v. State, 284 So.2d 525 (Miss. 1973), involved a pullover of a car for speeding. Upon stopping the car, an officer noticed that the car's occupants fit a description of persons who had just robbed a grocery store. Witnesses at the store had previously given the sheriff some descriptions, and the sheriff had given the information to all officers via radio.
At the scene of the stopped car, the officers waited with the suspects for the arrival of a witness who had been summoned to identify the suspects. This witness, who had been in the grocery store during the robbery, arrived and identified the car's occupants as the robbers. At that point, they were arrested and searched, producing incriminating evidence.
The defendants moved to suppress the evidence, claiming that the officers did not have probable cause to arrest them. The Court stated:

*1236 A crime had been committed. The persons who committed the crime were fleeing from the scene of the crime in an automobile. [citations omitted] They were apprehended because of a traffic violation, and when it appeared that they were apparently the persons who were said to have committed the crime, it became the duty of the officer to detain them. Section 2470, Mississippi Code 1942 Annotated (Supp. 1972). When they were identified, it became the duty of the sheriff to arrest them. [citations omitted.]
Chapman, 284 So.2d at 527. Apparently the Chapman court did not find the detainment and wait for the witness' identification to have been a unreasonable seizure or a fullfledged arrest requiring probable cause to arrest.
Parks v. State, 180 Miss. 763, 178 So. 473 (Miss. 1938), involved a relay of information based on an unknown informant's statement that a white man and a black man were traveling into Union County in a new Plymouth coach with a load of illegal whisky. The Union County sheriff drove to the highway and waited on the car. When he noticed a new Plymouth coach occupied by a white man and a black man, he chased the car. During the chase, the suspects ran a red light and then began to throw whisky out of the car. Upon pulling them over, the sheriff noticed broken bottles and whisky in the car. The defendants argued that the sheriff had lacked probable cause to chase the car, based solely upon it being a new Plymouth coach being driven by a white and a black man. But the court responded that the informant's description of the persons, their car, and the time and place of their travels was sufficient to meet the standard of probable cause. "There were too many coincidences for us to hold that the sheriff did not act upon probable cause." Parks v. State, 180 Miss. 763, 178 So. 473, 474 (1938).
According to Parks the informant's detail in the instant case was so self-proving that probable cause to search the car existed.
It must be remembered that the trial judge in the instant case concluded that probable cause to search existed at the time of the detainment. This is supported by the evidence: Deputy Vasillion's decision to "stake out" the highway on the night of January 15 was based on a few phone calls made that same day from a confidential informant who had given Vasillion reliable information in the past, but upon which no arrests had been made. Vasillion knew the informant, but did not disclose his name. Vasillion had also been familiar with Scotti and Terry, and the informant gave him their names. The fact that they were traveling from Texas, their identity as two females, their car make, their license plate, the ownership of the car under Scotti's name, were all confirmed by Vasillion before he pulled them over. Upon pulling them over, he confirmed that the two females were, in fact, Scotti and Terry, whom he had known previously. He made a cursory view of the passenger compartment of the car from the outside, without seeing any contraband. Without formally placing them under arrest, i.e., handcuffing and taking them "downtown," he then told them that they would have to wait until a search warrant was obtained.
Smith v. State, 229 So.2d 551 (Miss. 1970), states that an arrest, involves not only custody, but the idea that the detainee is held to answer for a crime. Here, Scotti and Terry were not held to answer for a crime, but held only for the purpose of a pending search or search warrant. They were not yet held to answer for a crime.
Also, Floyd stated, "We need not delineate our view of the dividing line between detention and arrest... ." Floyd, 500 So.2d at 992. We are now faced with such a delineation, and affirm that there are "degrees" of arrests, or detainments, which fall short of an arrest which requires probable cause.
Consider the situation where officers have probable cause to search a vehicle, and believe so, without seeking a warrant. The car's owner would have to wait on the officers to search the car; is this temporary detainment, pending the outcome of the search, an arrest requiring probable cause for arrest? Practicality requires that detainments which would become an arrest depending on the outcome of a pending investigation, are permissible.
*1237 Thus, what is an unreasonable seizure should be determined on a balancing of the scope of the intrusion upon the person's liberty with the governmental interest. Since an automobile was involved here, the mobility of the suspected contraband yields a high governmental interest. In comparison, the scope of the intrusion was minimal, especially considering that the officers did not formally arrest the suspects, and that their detainment was potentially temporary. At the time of the detention, there was no reasonable belief that it would turn into a more permanent detainment, i.e., a full arrest, in which they would be held to answer for crime.
We note that in such detainment situations, the police officers do not have unlimited authority, and may not be clothed with the authority to detain where they are not diligently investigating in such a way which will resolve the matter. Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1982); U.S. v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). But here, the short lapse of time, 5 or 10 minutes, did not necessarily give the police a reasonable chance to be judged as to their diligence or lack thereof in their investigation.
This assignment of error is without merit.

II.

WHETHER THE DEFENDANTS WERE ENTITLED TO A MISTRIAL WHEN THE STATE ELICITED TESTIMONY FROM THE WITNESS SHERIFF McKENZIE PREVIOUSLY EXCLUDED BY ORDER OF THE COURT.
This issue raises questions of great concern.
Even though the judge showed no partiality in front of the jury, the record does not make this Court confident that the trial judge in the instant case was in fact unbiased.
Furthermore, the Sheriff's testimony was elicited originally by the Court, through a leading question. The sheriff, apparently led also by the long discussion made in front of him, concerning his testimony, knew beforehand what he should say in order to aid the state.
Because of the borderline manipulation and leading of the witness on the part of the trial judge, this Court is lead to suspect that the trial judge was biased, thereby denying Scotti and Terry their right to a fair trial. However, this occurred outside the jury's presence, and this supposed bias appears only in the portion of the record where the pre-trial order is discussed.
In no way was the jury potentially led to believe that there were substantial amounts of marijuana burned. Also, the amount admitted without objection, 7.7 kilograms, about 17 lbs., sounds significantly more than the very little as the sheriff and other officers testified. Also, the initial question objected to did not disclose an amount, just that some marijuana was left on the ground after picking up as much of it as they could. It seems that no harm was done and that the purpose for which Scotti and Terry moved for this exclusion has been fully served: the jury was not presented with even a suggestion that the amount of marijuana left and burned was any amount of any consequence, especially in comparison to the 7.7 kilograms (17 lbs.) introduced through other testimony.
At the time of the initial objection, the most the sheriff said was that they did not pick up all the marijuana which spilled out of the bag. He then testified that what they did not pick up was a miniscule amount. The jury was told, without objection, that the officers had to sweep or rake up some that had spilled out. It seems reasonable that, just by the nature of sweeping/raking, that every bit could not be entirely picked up from the ground.
The harm caused by this mistake does not touch upon the substantive merits of the case. Therefore, as to the conviction before this Court on appeal, we find no merit in this assignment of error.
We also critique the original pre-trial order itself. Though this pre-trial order helped the defense strategy, such evidence would have been admissible. The simple fact *1238 that probative evidence is prejudicial does not make it inadmissible. The prejudicial effect must substantially outweigh the probative value in order to render it inadmissible. M.R.E. 403.
It is also notable that one reason for Scotti's and Terry's motion in limine was that such testimony would unfairly bolster the charge of intent to transfer. Since they were convicted of possession without the intent to transfer, it appears as though no harm was caused.
Because we cannot see how the conviction of possession of over one kilogram was related to this testimony, even if error, it would be harmless.
Nevertheless, the judge's actions were inappropriate, and we must quote the record to warn of the consequences of manipulation of a trial. See the Addendum to this opinion.

III.

WAS EVIDENCE RELATING TO HANDGUNS AND CASH FOUND ON THE DEFENDANTS, AND OPINION TESTIMONY REGARDING SAME, IMPROPERLY ADMITTED?
Scotti and Terry objected to the introduction of photographs of money and guns found at the scene. They further objected to officer Vasillion's opinion that guns and such money were things he would expect to find in the possession drug dealers.

A. Admissibility of the guns and money.
Scotti and Terry concede that this Court has previously admitted into evidence guns as "tools of the trade" evidence. Martin v. State, 413 So.2d 730 (Miss. 1982), Hemphill v. State, 566 So.2d 207 (Miss. 1990). However, they argue, money is not relevant, and if so, it is substantially more prejudicial than probative, citing M.R.E. 401 & 403. They also object to the admission of about $2700 in cash. Such a substantial amount of money makes it more likely that Scotti and Terry were involved in drug-dealing. Thus, the evidence was relevant. In this case, it was certainly not prejudicial, in light of the fact that they were not convicted of the intent to transfer. They were convicted of only the possession charge.

B. Admissibility of Vasillion's opinion.
The question presented is whether this opinion, that guns and money are usually associated with drug transactions, was an expert opinion. If so, Scotti and Terry argue that Vasillion was not listed as an expert witness in their discovery. The trial judge stated that Vasillion could not testify as an expert, but could give an opinion based on his previous personal knowledge. He then testified that he found money and weapons in this case, which based on his previous arrests in connection with controlled substances, he would expect to find with controlled substances.
However, we need not decide this evidentiary issue, for the admission of this testimony does not appear to have harmed the defendants' case. This testimony was offered primarily to promote the state's charge of intent to transfer. The question posed to Officer Vasillion was an inquiry into whether guns and money were associated with drug dealing, not mere possession. The sisters were convicted of possession of marijuana, but without the intent to distribute. In light of the entire record, this testimony was harmless in its effect upon the conviction of possession.
This assignment of error is without merit.

IV.

WHETHER THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON CERTAIN LESSER INCLUDED OFFENSES.
Jury instructions are not given unless there is an evidentiary basis in the record for such instructions. Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983).
A lesser included offense instruction should be generally given when a reasonable jury could find the defendant, pursuant to the evidence presented, not guilty of the principal charge but guilty of a lesser included offense. Toliver v. State, 600 So.2d 186, *1239 192 (Miss. 1992), Mackbee v. State, 575 So.2d 16, 23 (Miss. 1990).
Lesser included offense instructions should be refused only when the evidence could justify nothing other than a conviction on the principal charge, viewing the evidence in a light most favorable to the accused. Hester v. State, 602 So.2d 869, 873 (Miss. 1992).
First, Scotti and Terry argue that Sheriff McKenzie's testimony concerning the chain of custody is "confusing." However, McKenzie simply recanted his previous testimony, stating that he had gotten the Jackson and Gulfport crime labs mixed up. This claim does not appear probative to the issue of the lesser included offenses of possession of less than a kilogram.
The state cites Ford v. State, 555 So.2d 691 (Miss. 1989), in which a defendant charged with grand larceny, requested a lesser offense instruction of petit larceny. The defendant, charged with taking $750, argued that since only $100 was witnessed to have been taken, the lesser offense of petit larceny should have been considered by the jury. However, this Court responded that this was not real evidence, but "negative implication evidence." The Court stated that, giving the defendant all reasonable favorable inferences, the evidence could not sustain a verdict on the lesser offense. Id. at 697.
In the instant case, the only evidence supporting the defense's lesser included offense theory is possibly the cross-examination of the crime lab expert, Gross. Scotti and Terry argue that since Gross did not test the entire substance, and the amount actually identified to be marijuana was less than a kilogram and less than an ounce, then the evidence supported these lesser offenses. However, Gross stated that it was common to test representative samples to determine the identity of a large amount of a substance. Gross did so, and identified the entire substance to be 7.7 kg of marijuana. There is no testimony that contradicts this. Gross believed the entire substance was marijuana. Hence, the fact question for the jury was whether the entire substance was marijuana, or was the entire substance not marijuana. Gross did not submit to the proposition that only what he tested was marijuana.
Since the evidence presented a fact question of either all marijuana, or no marijuana, refusal of these jury instructions was not error.

V.

DID THE COURT ERR IN GRANTING STATE'S INSTRUCTIONS S-4A, S-4B AND S-5?
Scotti and Terry objected to instructions S-4A and S-4B on the grounds that they inaccurately stated the definition of possession.
Scotti and Terry objected to instruction S-5 on the ground that it singled out a portion of their testimony, and hence, the instruction amounted to an improper comment by the court on the defendants' testimony. This instruction stated that it was immaterial that the defendants did not pay for "the marijuana when they obtained it" or did not intend to receive money "at the time they were to deliver the marijuana."
On appeal, they raise a second argument, that these instructions, which use the term marijuana assumes facts which the state had the burden to prove. The instruction states that the defendants obtained marijuana, and the argument is that this incorrectly presumes the charged element of the identity of the substance. Instructions cannot assume the guilt of the defendant. Pegram v. State, 223 Miss. 294, 78 So.2d 153 (1955). The state has the burden to prove every element of the charged offense beyond a reasonable doubt. Heidel v. State, 587 So.2d 835, 843 (1991); Sloan v. State, 368 So.2d 228, 229 (Miss. 1979); City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).
The instruction should have more properly used a general term such as substance in place of marijuana. Because the state had the burden of proving the presence of marijuana, and the jury instruction assumed this element, these instructions were improper and would be cause to reverse.
*1240 However, Scotti and Terry did not raise the presumptive effect of these jury instructions as part of their objections at trial. Their grounds for objecting at trial had to do with the definition of possession as to instructions S-4A and S-4B, and with the singling out of the defendants' testimony as to instruction S-5.
Because these arguments are not preserved for appeal, this Court cannot reverse based upon them. The assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal. Baine v. State, 606 So.2d 1076 (Miss. 1992); Willie v. State, 585 So.2d 660, 671 (Miss. 1991); Crawford v. State, 515 So.2d 936, 938 (Miss. 1987); Watson v. State, 483 So.2d 1326 (Miss. 1986). See also, M.R.E. 103, Unif.Crim.R.Cir.Ct.Prac. 5.03.
This assignment of error is without merit.
AS TO HADDOX: CONVICTION OF POSSESSION OF OVER ONE KILOGRAM OF MARIJUANA AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
AS TO POWELL: CONVICTION OF POSSESSION OF OVER ONE KILOGRAM OF MARIJUANA AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, JAMES L. ROBERTS Jr. and SMITH, JJ., concur.
McRAE, J., not participating.

ADDENDUM
Trial Record, pp. 205-220.
McKenzie  Direct
MR. McDONALD:
Q. Now, Sheriff, when you were out there did you notice whether or not any of the marijuana had spilled out of the garbage bag?
A. Yes, sir. As I testified awhile ago, we had to pick up some.
Q. Were you able to get all the marijuana that had spilled out?
A. No, sir.
Q. Did you do anything to assure that the marijuana wouldn't fall into other people's hands that you couldn't get up off the ground?
MR. KITCHENS: Your Honor, we object.
THE COURT: Can you-all approach the Bench.
(COUNSEL BEFORE THE BENCH, OUTSIDE HEARING OF JURY)
THE COURT: They have an order on a Motion in Limine not to mention any spilled marijuana.
MR. McDONALD: I didn't know that.
THE COURT: He didn't know you-all had gotten that order.
MR. KITCHENS: That's not my problem.
THE COURT: I know. The order is very explicit.
MR. McDONALD: Let me ask this question 
MR. KITCHENS: Then we object and 
THE COURT: I don't think you need to object. The order is in the record.
MR. KITCHENS: We move for a mistrial.
THE COURT: Yes, sir. You've got one.
(BACK WITHIN HEARING OF JURY)
THE COURT: Mr. Anderson, let the jury go back in the jury room if they will for just a moment, please.
(JURY EXCUSED TO JURY ROOM AND THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE PRESENCE OF THE JURY:)
MR. McDONALD:
Judge, could I ask the Court a question? Could I ask her to read back the question that I asked in light of this?
THE COURT:
Let the record show that Mr. McDonald was not present in Marion County yesterday when we went through the Motion in Limine and the Court discussed it in full detail, of *1241 course, with Mr. Kitchens and Ms. Sones and Mr. Douglass. And pursuant to that the Motion in Limine was sustained and the order was furnished stating that the Court excluded admitting at the trial any and all testimony, photographs, and/or other evidence of every kind and character to the effect that at the time of their arrest on the instant charge the Defendants possessed more marijuana than was included in the materials submitted in this case to the Mississippi Crime Laboratory for weighing and analysis. And by agreement of all parties the order encompassed that it was further ordered and adjudged that neither the Prosecution nor the Defense shall make reference in the presence of the jury to any alleged marijuana which the Prosecution claims or contends to have been connected with these Defendants in addition to that submitted by the investigating officers to the Mississippi Crime Lab.
The whole purpose of the motion was to specifically exclude any marijuana which spilled, because both parties agreed that this case would be tried on the weight exactly in the method and manner it was submitted to the Crime Lab, and nothing would be alluded to as being on the road or being burned for the simple reason that this would prejudice the Defendants in that the jury could then speculate or surmise that great quantities of marijuana were required to be burned; and this was the total reason for this order.
MR. McDONALD:
Judge, if I could just ask.
The reason I would like you to read it back, Mrs. Fox, is to see that  I recall that the Sheriff indicated that some had spilled, they picked it up and put it back in the bag, and I started to ask another question when counsel arose at that time and came forward; and I'd like her to read that back to see if it wouldn't be  I don't think that he said he burned it. If you can read it back 
THE COURT:
Well, read it back and we'll see.
MR. McDONALD:
 to see if we could prevent going into it.
MR. KITCHENS:
Your Honor, Mr. McDonald has unwittingly 
MR. McDONALD:
It wouldn't hurt to read the record to see, Judge.
MR. KITCHENS:
He has unwittingly violated the letter and the spirit of the Court's order. He is bound with the knowledge that Ms. Sones and Mr. Douglass from his office had about this, and I know Mr. McDonald has utmost respect for the Court and would not have done that had he been aware of it. But nevertheless the harm has been done; and he asked the Sheriff whether he did anything about other marijuana 
THE COURT:
Well, let's just read it back.
Court Reporter read back as follows:
"Question: Were you able to get all the marijuana that had spilled out?
"Answer: No, sir.
"Question: Did you do anything to assure that the marijuana wouldn't fall into other people's hands that you couldn't get up off the ground?"
THE COURT:
That's when I stopped it. That much had gotten in.
MR. McDONALD:
What I'd like to do, Judge, is ask him whether or not all the marijuana that was found out there was placed in the bag and sent to the Crime Lab, in light of the Court's Motion in Limine. And if he answered in the affirmative, you know, then I think that would take us out of the position that we're in now.
MR. KITCHENS:
That would not be true; it's perjurious.
MR. McDONALD:
We have not  if it's not true, the Order in Limine prevents all of what happened from being made known to the jury.
*1242 MR. KITCHENS:
You can't correct a mistake with perjury, Your Honor. I know the Sheriff is not here to commit perjury. But that is what counsel is suggesting really. And, Your Honor, I move for a mistrial. I understood the Court to say the motion was sustained.
THE COURT:
Yes, sir. At the state that we're in right now, unless, of course, you know, the Supreme Court has admonished all the trial judges to try everything in the world to correct anything besides giving a mistrial, if we can, and not just, you know, grant one if it could be avoided. The simple reason is, sometimes if you do that, jeopardy attaches and it's double jeopardy to try the Defendants again.
And, of course, I have got to make certain  I know the whole reason that you and the State agreed to this order was so that the jury wouldn't be under the mistaken opinion that great quantities of marijuana went in the ditch or went elsewhere, and that, you know, they only gathered up a part or portion of it. But Buddy didn't know that the order was entered.
MR. KITCHENS:
Of course, part of the problem was, Your Honor, there is no way to measure what was out there.
THE COURT:
Exactly.
MR. KITCHENS:
Nobody knows how much was out there.
THE COURT:
Exactly.
MR. McDONALD:
What if the Sheriff could testify that all the marijuana that could be seen was put in the bag and sent to the Crime Lab?
THE COURT:
I don't think that would solve it. Let's just go off the record a minute.
(OFF THE RECORD DISCUSSION, during which time the Court Reporter read furthe back from the record, as follows:
"Question: Now, Sheriff, when you were out there did you notice whether or not any of the marijuana had spilled out of the garbage bab?
"Answer: Yes, sir. As I testified awhile ago, we had to pick up some.
"Question: Were you able to get all the marijuana that had spilled out?
"Answer: No, sir.
"Question: Did you do anything to assure that the marijuana wouldn't fall into other people's hands that you couldn't get up off the ground?")
THE COURT:
All right. Get on the record, Matty Jo.
Let the record show that the Court just does not want to grant a mistrial at this point if the jury cannot be prejudiced in anybody's favor against anybody. And that to try a case this long and then just declare a mistrial for some insignificant reason that the Supreme Court could later look and say that this court should have found a way to avoid this and therefore jeopardy attaches and say that double jeopardy is involved, the Court is going to fall into that trap.
The Court is now going to ask the Sheriff:
Q. Under your oath, Sheriff, could you say that if all of the marijuana was not placed back in the bag, any that was left was just of a small, insignificant amount?
A. Yes, sir, it was.
THE COURT:
All right. If the Sheriff can say that, the Court finds that Mr. McDonald did not intentionally violate the order. That the Court does take judicial knowledge that he is charged with knowing what orders are in the court file; and the intent and purpose of the order was so that the jury would not think that the amount of marijuana, and that great significant amounts or quantities of marijuana were not recovered, and that the Defendants were in possession of great amounts of marijuana that are not before the Court.
The Court does not feel the jury will be prejudiced against the Defendants in any method or manner, and the Sheriff will not violate his oath and commit perjury by stating *1243 that if he didn't recover it all, the amount not recovered was of just a minute or insignificant amount.
So in order to avoid declaring a mistrial on a point that is not really germane and not prejudicial to either side, the Court is going to overrule the motion for mistrial at this time and admonish counsel not to refer to this point in time any more.
MR. KITCHENS:
Your Honor, if I may be heard briefly. When we approached the Bench just now when the testimony and questions were being elicited by Mr. McDonald, I came up and apprised Your Honor that 
THE COURT:
 that you were going to ask for a mistrial, and I said that 
MR. KITCHENS:
 and you said that, "You've got it."
THE COURT:
 grounds had been laid for a mistrial. And at that point I was prone to grant the mistrial, Mr. Kitchens. And now upon reflection back and trying to reconstruct this to where I don't have to do that, which I think is my duty, then I am going to reconsider at this point the motion for mistrial had not at this point been sustained, and the jury has not been instructed a mistrial has been granted. So the Court is now going to do like the Supreme Court does, and reconsider, withdraw the former opinion, and substitute this one therefor.
MR. KITCHENS:
Your Honor, Sheriff McKenzie is holding up his hand, and we would object to him testifying just on some voluntary basis.
THE COURT:
Well, let me ask the Sheriff this. I'm like you, I don't want him to have to give any perjured testimony. If he isn't comfortable with what I just asked him, obviously I'm not going to require him to testify to anything that is not the truth. And if he can't testify in that vein, I'm not going to require him to do something that is not the truth, that's what I'm saying. So if that's his problem, I sure want to know it before I bring the jury back in and have something else happen.
MR. KITCHENS:
Your Honor, I am just trying to be heard on my motion here, is all I'm doing.
THE COURT:
All right.
MR. KITCHENS:
Your Honor, the testimony so far has been that the substance believed to be marijuana was contained in a large garbage bag. Nobody knows how full that bag was; there's been no testimony. And the jury is only left to speculate as to how full the large garbage bag was. The Sheriff has testified that there was some quantity spilled out there on the ground that was not capable of being weighed or measured by anybody. The Sheriff has testified that that has been destroyed. So nobody 
THE COURT:
No. He never did testify 
MR. KITCHENS:
 will ever know how much was out there.
THE COURT:
He didn't testify to that in front of the jury, according to the record.
MR. KITCHENS:
No, sir. I mean to you just now, Your Honor.
THE COURT:
Oh, yeah.
MR. KITCHENS:
Then if Your Honor please, I know the Court is trying to exercise judicial economy here, and certainly counsel's remarks are not intended to disparage the Court. But, Your Honor, being the Court took it upon itself to ask this witness very leading questions about whether he could honestly say that he destroyed an insignificant amount of marijuana; and, of course, the Sheriff, as would be expected, told the Court what the Prosecutor wanted to hear, that he could say that.
THE COURT:
So you're saying he's giving perjured testimony?
*1244 MR. KITCHENS:
Sir? I'm not suggesting that, Your Honor.
THE COURT:
I'm not suggesting he give perjured testimony. I'm just asking him can he say that under his oath. If he can't, then I've got to reconsider the whole 
MR. KITCHENS:
What I was doing, Your Honor, is objecting to the procedure of the Court going back and trying to rehabilitate the State's witness from them.
THE COURT:
Mr. Kitchens, I'm not trying to rehabilitate him. Because from what Mrs. Fox has read to me, he hasn't testified to the quantity out there at all in front of the jury. So there is no rehabilitation. All I'm trying to do is not sit here from 8:00 o'clock this morning until 4:00 o'clock this afternoon and declare a mistrial over a point that doesn't amount to a hill of beans; because you are not going to get a perfect trial in this case if we try it 365 days a year. And you're going to get a fair trial if I've got anything to do with it. But you will never get a perfect trial. And every witness isn't going to testify exactly like they're supposed to within the Rules of Evidence. Every question is not going to be asked within the Rules of Evidence. So what I am saying is, if it is not so prejudicial that a mistrial must be declared, I'm going to make every effort I can to keep from declaring a mistrial. That's what I'm going to do; you object, and then let me go ahead and do what I'm going to do and let's get on with the program here.
MS. JOHNSON:
Your Honor, 
THE COURT:
Yes.
MS. JOHNSON:
 I'm sorry 
THE COURT:
Go ahead.
MS. JOHNSON:
One question. I would just like to point out an additional ground, Your Honor, of why we should be granted a mistrial. Obviously we can't cross examine the Sheriff on this issue without the Defendant undoing the very thing they asked the Court to give the order to do.
THE COURT:
Why would you want to cross examine him on the point 
MS. JOHNSON:
Sir, that is the only way we have to test the veracity 
THE COURT:
Are you saying there was a large amount of marijuana that was destroyed?
MR. KITCHENS:
Your Honor, I don't think she has to say that to make the point that 
THE COURT:
Well, I mean, I'm just saying, why would you cross examine him on a point that is insignificant and doesn't matter?
MR. KITCHENS:
Your Honor, it is up to counsel to decide what to cross examine the witness on within the Rules of Evidence.
THE COURT:
I am just asking the purpose. Do I have that right or not?
MR. KITCHENS:
Sir?
THE COURT:
Never mind
Q. Sheriff, you were having a problem. Is it with the testimony we're discussing, or what is the problem? Mr. Kitchens said you needed to say something. What 
A. Well, what I was going to say, we was there with flashlights. We was out there looking at this with flashlights. Of course, like I said, there was grass. And, of course, I knew we couldn't get up every little crumb, but I said, "Well, I'm going to set fire to it and make sure nobody gets none of this."
Q. What I'm asking you is though, can you honestly under your oath say that if you didn't get all the marijuana, what you didn't get would be just of a little, small, insignificant amount?
*1245 A. Oh, yes, sir. I'm not gonna lie for nobody.
Q. That's right. But I mean, will that be the truth under your oath?
A. I'd say it wouldn't make a joint, you know, 
Q. Well, don't say that. Just say it's a small, insignificant amount.
MR. KITCHENS: Your Honor, we would like to interpose an objection at this point to, Number One, Your Honor's proceeding with this type of questioning of this witness; and then next, apparently the Court is going to let the witness give his opinion as to whether it was insignificant or small. These are highly subjective 
THE COURT: Would you like me to use any other word? I'm not hung up on "insignificant" and I'm not hung up on "small," you know.
MR. KITCHENS: No, sir. I'd rather you didn't use any.
THE COURT: What verbage would you-all like to use?
MR. KITCHENS: None, Your Honor.
THE COURT: That's correct. But we're gonna use something. So I'm sure you'll find fault with any word that we choose to use.
All right. Then let the record show that as long as the Sheriff can testify that the amount of marijuana, if any, that wasn't placed back in the bag was just so small that it just wasn't even noticeable, or however you want to phrase it, Sheriff, in that vein.
MR. McDONALD: And might I ask him that when they get back out here?
THE COURT: Yes. I want you to ask him in front of the jury so the jury will not be led to think that marijuana rolled down a hill or large quantities or bales of marijuana were left all over the highway. That was the sole purpose of the Motion in Limine.
MR. McDONALD: Webbie, do you understand nothing about burning; you can't say anything about fire and burning; do you understand that?
A. Yes, sir.
THE COURT: Just answer the question and then we will move on.
MR. McDONALD: Just a small amount, if any.
THE COURT: Mr. Anderson, if you'll let the jury come in.
(JURY READMITTED TO COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE OF THE JURY:)
THE COURT:
All right All members of the jury are present. If we are ready to proceed.
MR. McDONALD: (continuing with Direct Examination)
Q. Sheriff, after you put the green leafy substance you found in Exhibit NO. 7, was there anything other than just a small  if any, small minuscule, insignificant amount of anything left in the grass or on the ground?
MR. KITCHENS: Your Honor, we object on the grounds previously stated, as well as on the grounds that that is a leading question.
THE COURT: All right. I'll sustain as to leading.
MR. McDONALD: (continuing)
Q. If there was anything left on the ground, of what quantity would it have been?
A. If there was any, it would be a very, very, little, something I couldn't see.
Q. Thank you, Sheriff.
MR. McDONALD: I believe that's all the questions we have.
THE COURT: All right. You may cross examine.
MR. KITCHENS: No questions.