500 So.2d 989 (1986)
Donnie Wayne FLOYD
v.
STATE of Mississippi.
No. 55977.
Supreme Court of Mississippi.
December 10, 1986.
Rehearing Denied February 11, 1987.
*990 Ronald W. Lewis, Holcumb, Dunbar, Connell, Chaffin & Willard, Oxford, Farese, Farese & Farese, Ashland, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, C.J., and DAN M. LEE and SULLIVAN, JJ.
DAN M. LEE, Justice, for the Court:
Donnie Wayne Floyd appeals his conviction for possession of more than one kilogram of marijuana with intent to sell, transfer or distribute and his conviction of possession of cocaine. Floyd was convicted in Alcorn County Circuit Court where he was sentenced to fifteen years and fined $35,000.00 on the marijuana charge and sentenced to three years and fined $3,000.00 on the cocaine charge, the sentences to run consecutively. Floyd assigns eight errors in the trial below. Since we find his conviction must be reversed because the trial court erred in failing to suppress illegally obtained evidence, we need only discuss this error.

FACTS
Donnie Floyd began driving home to Memphis from Miami early on the morning of July 13, 1982. He was driving an Oldsmobile. Unknown to police initially, Bruce Allen Boches followed Floyd from Miami driving a white Pontiac. About 7:30 p.m. that day the two approached a roadblock on U.S. Highway 72 just east of Corinth.
Sgt. H.B. McDaniel of the Mississippi Highway Patrol was in charge of the roadblock. McDaniel and several troopers were inspecting licenses, car registrations and tags. McDaniel saw the two cars pull into a driveway down the highway about one hundred to one hundred fifty yards from the roadblock. The Oldsmobile pulled in first followed by the Pontiac. McDaniel decided to drive down to the driveway to investigate. When he approached however, the Pontiac pulled out of the driveway and headed away from the roadblock. McDaniel pulled the Pontiac over. While McDaniel approached the Pontiac, Floyd in the Oldsmobile pulled out of the driveway and proceeded to the roadblock. Having his driver's license and other papers in order, Floyd was passed through without incident and headed west. Sometime thereafter McDaniel radioed ahead and attempted to have troopers detain him.
After questioning Boches, McDaniel learned Boches had a Tennessee drivers license and the Pontiac had a substitute Mississippi tag. Boches did not have the car registration and told McDaniel the Pontiac was owned by a friend whose name Boches did not know. He later said that the Pontiac was actually owned by the friend of a friend. McDaniel leaned his head into the Pontiac while speaking to Boches and smelled marijuana. McDaniel told Boches he would be held while troopers investigated whether the car was stolen and McDaniel summoned Trooper Harold Holder away from the roadblock to drive the Pontiac back to the roadblock. Holder also testified he smelled marijuana in the Pontiac and it handled as though heavily loaded in the rear. McDaniel drove Boches to the roadblock and at this time Boches told him the name of the driver of the Oldsmobile. Troopers on two different occasions radioed the New Albany district headquarters to put out a bulletin which contained a description of the Oldsmobile and the driver and a request that the Oldsmobile be stopped and the driver held.
Boches was taken to the Alcorn County jail and the Pontiac was impounded. Troopers initiated efforts to obtain a search warrant for the Pontiac. After Boches was brought to jail, McDaniel received a telephone call from an unidentified person who wished to know if Boches was at the jail and if he could come to the telephone. McDaniel denied this request and the conversation ended. Within several minutes, *991 two troopers left to search pay telephones in the area of U.S. Highway 72 West.
Meanwhile, Trooper Maurice Graddy had taken up a position along U.S. 72 in response to the radio message which he received about 8:00 p.m. About an hour later Graddy spotted the Olds and pulled the car over. Graddy testified at the suppression hearing that the driver exited the car and approached Graddy. Graddy inspected the driver's license and asked him to sit in the front passenger seat of his patrol car. Graddy then informed his New Albany district headquarters that Donnie Floyd was in custody. Headquarters replied that Graddy should use extreme caution, whereupon Graddy handcuffed Floyd for his own protection. Troopers John Wayne Hobson and Thurman Clayton arrived as backup about five to ten minutes later, Graddy testified.
The Oldsmobile's engine was still running when Hobson arrived, and he reached into the car, turned off the engine and pulled out the keys. He smelled marijuana and canteloupe in the car. Before taking out the keys, Hobson had paused at the rear of the Oldsmobile and smelled marijuana. He returned to the rear of the Oldsmobile and again smelled marijuana. With Clayton watching, Hobson opened the trunk and discovered three bales of some substance wrapped in plastic. The middle bale of the three was not wrapped completely so Hobson could see a leafy substance later identified as marijuana. Hobson closed the trunk and followed as Trooper Clayton drove the Oldsmobile to the Alcorn County Jail.
The Oldsmobile was later searched again at the Alcorn County Jail. There was contradictory testimony concerning whether the Oldsmobile was searched after or contemporaneous with a search of the Pontiac incident to a search warrant. Maj. W.C. Mayhall, Alcorn County Deputy Sheriff, searched the Oldsmobile and found a shaving kit on the floorboard. In the kit was a plastic bag of white powder which was visible because the kit was open. The substance was later identified as 1.2 grams of cocaine.
The search of the Pontiac revealed four bales of substance later identified as marijuana.
The trial court held a suppression hearing and determined the marijuana and the cocaine seized from Floyd's Oldsmobile to be admissible because they were not the product of an illegal arrest. Floyd contends this was error. This contention necessarily requires that we determine whether the trial court erred in finding that Floyd was arrested upon probable cause.

DISCUSSION OF LEGAL ISSUES

DID THE HIGHWAY PATROL TROOPERS HAVE PROBABLE CAUSE TO ARREST FLOYD?
There is no question that Floyd was apprehended without a warrant. Under such circumstances
[A] police officer must have (1) reasonable cause to believe a felony has been committed; and (2) reasonable cause to believe that the person proposed to be arrested is the one who committed it.
* * * * * *
"Probable cause" means less than evidence which would justify condemnation, but more than bare suspicion. Hester v. State, 463 So.2d 1087 (Miss. 1985), citing Powe v. State, 235 So.2d 920 (Miss. 1970).
Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986).
In Jones v. State, 481 So.2d 798, 800-01 (Miss. 1985) it was said:
In Swanier v. State, 473 So.2d 180 (Miss. 1985), this Court stated:
The existence of "probable cause" or "reasonable grounds" justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The determination depends upon the particular evidence and circumstances of the individual cases.
*992 Id. at 186, quoting Smith v. State, 386 So.2d 1117, 1119 (Miss. 1980).
Our cases recognize that law enforcement officers may detain a person short of an actual arrest for purposes of an investigative stop. McCray v. State, 486 So.2d 1247 (Miss. 1986). Vehicles also may be the subject of an investigative stop. See United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
An investigative stop may be made even where officials have no probable cause to make an arrest as long as they have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony ... or `some objective manifestation that the person stopped is, or is about to be engaged in criminal activity.' ..." McCray, 486 So.2d at 1249-50. An investigative stop must be limited in scope, however. "Where a detention ... exceeds the scope of an investigative stop, it approaches a seizure. To justify a search and seizure without a warrant, the state must show probable cause for arrest." Id. at 50.
We need not delineate our view of the dividing line between detention and arrest, for as a practical matter it is clear Floyd was arrested, at the latest, when Trooper Graddy handcuffed him. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). No formal declaration is required for the subject to be considered under arrest Swanier, 473 So.2d at 196, and in this factual setting Floyd could not have reasonably believed he was free to leave. See Riddles v. State, 471 So.2d 1234 (Miss. 1985). Indeed, the state does not contend otherwise. Trooper Graddy testified at the suppression hearing that at the time Floyd was handcuffed he was under arrest.
Since the arrest was made without benefit of a warrant, and since the arrest preceded the discovery of the marijuana in Floyd's vehicle, probable cause must be based on what the officers knew at the time of Floyd's arrest.
Though the issue is not without some difficulty, we think the troopers arrested Floyd at a time when they had at most a suspicion that Floyd was involved in criminal activity. The arrest having been made on less than probable cause, it was illegal.
At the time Graddy handcuffed Floyd, the troopers knew that Floyd had pulled off the road into a driveway with the Pontiac driven by Boches before reaching the roadblock. They knew that Boches mentioned Floyd by name. They knew someone had called the Alcorn County jail asking for Boches.
It is true Sgt. McDaniel and Trooper Holder had smelled marijuana in the Pontiac Boches was driving, but no one at the roadblock smelled marijuana in Floyd's car as he was passed through the roadblock. Nothing else linked Floyd to the marijuana in the Pontiac. Boches had told police the Pontiac was not his but McDaniel did not testify to anything Boches said which connected Floyd to the marijuana or to the Pontiac. The Pontiac was not reported stolen.
No doubt, given the information the patrolmen had concerning the Boches vehicle they had a suspicion that Floyd might have been involved in some criminal activity. This suspicion may or may not have warranted detaining the Oldsmobile to question Floyd.[1] However, we cannot agree with *993 the trial court that Floyd and Boches were obviously working in concert to transport marijuana. The state argues probable cause existed by virtue of the assumption that Floyd must have known what Boches was doing.
On the contrary, everything the officers knew at the time of Floyd's arrest was consistent with Boches guilt but was little more than speculation and conjecture as to Floyd. It certainly did not rise to the dignity of probable cause. At the time, the officers had no idea that Boches and Floyd had traveled from Miami. McDaniel only learned Floyd's name as the result of an innocuous question such as "who's your friend?" Officers at the roadblock did not smell marijuana in Floyd's Oldsmobile when he was passed through, and Floyd's papers were in order. The fact that Floyd approached the roadblock while Boches did not could have denoted some joint criminal escapade, but it also could have meant that Floyd was unaware of what contraband Boches might have been transporting.
McDaniel initially told Boches that he would be held until officers could determine if the Pontiac was stolen. No doubt McDaniel might have suspected Floyd knew something about the ownership of the Pontiac, and this could have provided another basis for detaining Floyd. But even if McDaniel was concerned only with Floyd's possible involvement with car theft, there surely existed means of resolving this question short of arrest.
"Based upon the totality of circumstances of this case," Rome v. State, 348 So.2d 1026, 1028 (Miss. 1977), we hold there was insufficient evidence at the time of Floyd's arrest to establish probable cause that Floyd had committed or was committing a felony.
In Rome we found illegal an arrest made by an officer who "surmised that the car and its then unidentified driver were possibly on an unlawful mission. The officer's hunch proved to be accurate, but as this Court has previously said, an unlawful search, though made in honest belief of right, remains unlawful and its fruits forbidden." Id. at 1029.
Therefore, the motion to suppress should have been sustained and the marijuana and the cocaine found in Floyd's Oldsmobile should not have been admitted over appellant's objection.
We note finally that Floyd raises as error his prosecution under a multicount indictment. Since we reverse on other grounds we do not reach this contention. However, it appears to us Floyd's argument is well taken in this instance. Finding that Floyd was illegally arrested, and the search incident thereto was invalid, his conviction is hereby reversed and remanded.
REVERSED AND REMANDED.
*994 WALKER, C.J., ROY NOBLE LEE and HAWKINS, P. JJ., and PRATHER, ROBERTSON, ANDERSON, SULLIVAN and GRIFFIN, JJ., concur.
NOTES
[1] Trooper Graddy had neither a reasonable suspicion nor probable cause. Graddy acted on the most cursory of directives, and developed no information during the stop which might have helped establish probable cause. In fact, Graddy had no idea what Floyd was wanted for. His testimony during the suppression hearing makes this clear.

During examination at the suppression hearing, Graddy was asked the following questions and he gave the following responses:
Q. What were the instructions you were given by headquarters?
A. They said, you know, they gave me a description of the vehicle and, you know, gave us the name of the person driving it and told me to be on the lookout for it and if I saw it to stop it and to advise them back when I had the man stopped and I did.
* * * * * *
Q. Did Mr. Floyd commit any offense in your presence?
A. No, sir.
Q. Was he cooperative?
A. Yes, sir.
Q. Did he offer you any resistance?
A. No, sir.
Q. Now, when you stopped him, isn't it a fact, Patrolman Graddy, that he asked you why you were stopping him?
A. Yes, sir.
Q. And you said, "I don't know, I was just told to."?
A. Yes, sir.
Q. And then when you called in and told them in Corinth that you had stopped Donnie Floyd, then he asked you again why and you still didn't know, did you?
A. No, sir.
* * * * * *
Q. In other words, you had no charges against him?
A. No, sir, I didn't.
The state argues that Graddy's personal knowledge is not determinative of probable cause because we must take into account the "collective knowledge" of the officers working on the investigation, or we must look to the total of the laminated layers of information officers had at the time of Floyd's arrest.
However, we do not reach the question of whether the reasonable suspicions of one or a group of officers may provide another officer with grounds for an investigative stop, since it is clear Floyd was not merely detained but arrested. Likewise, we need not determine to what extent law enforcement officers may conduct searches or make arrests based on information known to other officers, since we hold that the officers lacked probable cause in toto.