KITCHENS, Justice,
Dissenting:
¶ 58. The majority finds the actions of the police justified, reasoning that Gales’s apprehension was based on reasonable suspicion to conduct a Terry stop and probable cause to arrest. With respect, I disagree. Gales was a black man who happened to be in possession of some cash and who may or may not have been running at the time he was detained. That is not a sufficient basis for the full custodial detention of Gales, at gunpoint, which immediately followed the initial police sighting of him. The Fourth Amendment to the United States Constitution guarantees:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
To like effect, Article 8, Section 23, of the Mississippi Constitution guarantees:
The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.
¶ 59. In Terry v. Ohio, the United States Supreme Court held:
[Cjourts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective eviden-tiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials. And, of course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate.
Terry v. Ohio, 392 U.S. 1, 15, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added). Because the actions of the arresting officer in the case at hand were not predicated upon ample factual justification, I respectfully dissent.
¶ 60. The Greenville Police Department commenced an investigation following a robbery at the Hyatt Food Mart on December 19, 2011. Investigator Jeremy Ar-endale, who had been called to the scene, viewed the store’s surveillance videos and observed a black male wearing a blue shirt, black pants, and a white hoodie. Arendale conveyed that descriptive information to the police dispatcher who relayed it via police radio. Officer Tabari Thomas, having almost completed his shift for the evening, heard the dispatch and “thought [he] saw somebody running” in the area of Bland Street and North Harvey Street, at least five blocks from the scene of the crime. Thomas testified that he “turned [his police car] back around” and saw Brandon Gales, a black male who was wearing a long-sleeved gray shirt and blue jeans. Gales allegedly was “trying to walk to try to play it off at that time like he wasn’t running.” Thomas drew his gun, pointed it at Gales, and approached him, holding Gales at gunpoint from the *650 outset of their encounter. When asked why he was out of breath, Gales reportedly responded that he had just left a- gambling house.
¶ 61. Officer Thomas then patted Gales down. Upon feeling “a little bulge in [Gales’s] back pocket,” Thomas asked what it was. Gales responded that it was money he had won at the gambling house. Thomas sought an updated description from dispatch, which revealed that the suspect being sought was wearing blue jeans, not black pants as Thomas had thought when he stopped Gales. Thomas then handcuffed Gales, which he testified was “a safety issue for mine and his,” and was instructed to take Gales to the scene of the crime. Thomas did not understand that he had, in fact, arrested Gales at that point, but testified that he was detaining him “for further investigation.”
¶ 62. Gales was driven by Officer Thomas to the Hyatt Food Mart. Investigator Arendale testified at the suppression hearing that he pulled a handcuffed Gales from the back seat of the police cruiser, saw “money in his back pocket,” and “took some pictures of the money that was in his back pocket and also in his front pocket.” Arendale then returned into the store where he had been watching surveillance videos and asked the store clerk, Abdul-hakim Weber, about the specific denominations of cash which had been stolen. Ar-endale returned to the police cruiser and removed the cash from Gales’s pocket. Rifling through the cash, Arendale discov-' ered a red stamp on one of the bills, returned inside the Hyatt Food Mart, and asked Weber whether “anything [was] unusual about the cash” taken from his store. According to Arendale, Weber responded that “one of the bills he got from the banker had a red stamp on it.” Because the red stamp on the bill seemingly matched the bill taken from Weber’s pocket, according to Arendale, Gales was placed under arrest (like Thomas, apparently not appreciating that the handcuffed Gales already had been arrested).
1. Officer Thomas articulated no reasonable suspicion to justify Gales’s initial apprehension.
¶ 63. The majority notes Gales’s concession in his motion to suppress that “the Greenville Police Department had the right to stop and question the defendant, and even the right to conduct a pat-down for weapons.” According to the majority, this acknowledgment forecloses appellate review, since “the issue of whether Officer Thomas had legal grounds to conduct the ■ Terry stop of Gales in the first place was conceded and not argued before the trial court.” Yet Gales’s counsel clearly raised the propriety of the initial stop ore terms during the hearing on the motion to suppress: “[i]n this case, the radio transmissions clearly gave one description. This individual fits another. He is five blocks from the location.” Moreover, the trial court’s order denying Gales’s motion to suppress directly analyzed the initiation of the police stop: “whether the officer’s actions were justified at its inception, that is, did the officer point to specific and articu-lable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.” (Emphasis added.) Further, in his written motion to suppress, Gales stated the following: “[the police] did not have the right to transport [Gales] anywhere, nor did they have the right to conduct a search. The discovery of the money was a result of this violation of the defendant’s Fourth Amendment Rights.” The question of whether the police exceeded, the scope of Terry thus is squarely before the Court.
¶ 64. Terry held the following, nothing more:
*651 We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others’ safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
Terry, 392 U.S. at 30, 88 S.Ct. 1868 (emphasis added). In that case, one Officer McFadden suspected “two men of ‘casing a job, a stick-up’ ” because they conducted a “casual and oft-repeated reconnaissance of the store window on Huron Road.... ” Id. at 6, 88 S.Ct. 1868. He had observed one man leave the other, walk to the storefront, pause to peer into the store window, and return to the other man, who then did the same. Id. All in all, “[t]he two men repeated this ritual alternately between five and six times apiece-in all, roughly a dozen trips.” Id. Later, a third man appeared, conversed with the two men, and then walked off. Id. His suspicions aroused, Officer McFadden approached the men and asked their names, fearing that they may have had a gun. Id.
¶ 65. “When the men ‘mumbled something’ in response to his inquiries,” Officer McFadden ordered the three men to go inside a store and “to face the wall with their hands raised.” Id. at 7, 88 S.Ct. 1868. McFadden then patted Terry down, felt a handgun, removed Terry’s overcoat, and located a .38-caliber revolver in Terry’s overcoat pocket. Id. He also located another revolver on Chilton, the second suspect, but found no weapons on Katz, the third suspect. Id. He did not put hi's hands beneath the outer garments of either Terry or Chilton until he had discovered weapons. Id. Finding that McFadden had a reasonable, articulable suspicion “to believe that [Terry] was armed and dangerous,” the Supreme Court affirmed Terry’s conviction for carrying concealed weapons and concluded that the revolver seized from Terry was “properly admitted in evidence against him.” Id. at 30, 88 S.Ct. 1868.
¶ 66. Here, both the majority and the trial court concluded that Officer Thomas’s initial apprehension of Gales was “grounded in a reasonable suspicion that Gales was connected with the armed robbery.” That conclusion was reached notwithstanding that the most Officer Thomas observed was a young man walking — or maybe running down a street. This cannot be said to be “unusual conduct,” and the officer harkened back to nothing in. his experience which led him to conclude from that observation “that criminal activity may be afoot” and that “[Gales] may be armed and presently dangerous.” Id.
¶ 67. At the suppression hearing, Thomas testified that the “be-on-the-lookout” radio transmission described a black male wearing a blue shirt, black pants, and a white hoodie heading toward Belle Aire Street. Officer Thomas testified that Gales “had on a gray shirt ... blue jeans and a brown pair of, I would say Clark Walla-bees,” and was “walking south.” On direct examination, Officer Thomas testified that Gales’s pants and shoes matched the description of the suspect associated with the robbery of the Hyatt Food Mart which the officer had heard over his police radio, “everything except for the hoodie.” But on cross examination, Officer Thomas ad *652 mitted that Gales was wearing no blue shirt, no black pants, and no white hoodie. He also conceded that Gales was not heading in the direction of Belle Aire Street. Officer Thomas answered “[tjhat’s true” when asked whether he “knew he [Gales] didn’t fit any of the description....” Further, Officer Thomas admitted that the initial description included no information regarding the suspect’s shoes. Nevertheless, he testified that he “just felt that that was a little suspicious at the time. On the description, as far as the clothing description....”
¶ 68. Because the record does not support their assertions, both the majority and the trial court failed to articulate what “reasonable suspicion, grounded in specific and articulable facts,” justified the initial stop of Galés. Eaddy v. State, 68 So.3d 1209, 1213 (Miss.2011) (quoting Walker v. State, 881 So.2d 820, 826 (Miss.2004)); Terry, 392 U.S. at 21, 88 S.Ct. 1868 (“the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.”) Nevertheless, the majority finds the existence of reasonable suspicion because [they say] “Gales was in the immediate vicinity of the crime scene soon after the robbery, partially matched the description of one of the robbers, and appeared nervous.” Additionally, according to the majority, “Officer Thomas’s suspicions were further piqued when Gales, who was wearing casual shoes, stopped running when he noticed Officer Thomas’s presence.”
¶ 69. The transcript from the suppression hearing makes clear that Gales was at least five city blocks from the crime scene at the time of his apprehension, which cannot be said to be “in the immediate vicinity” of the crime scene. In no respect, save and except his being a black male, did Gales “match the description of one of the robbers” at the time Officer Thomas stopped him; his clothing was starkly distinct from that of the suspect described over the police radio. Further, the appearance of nervousness noted by the majority is understandable. An appearance of nervousness is especially understandable here, in light of Officer Thomas’s testimony at trial that he summoned Gales at gunpoint:
I drew my firearm, pointed it out at him, and I told him to stop, drop any weapons if he had any, and I told him to come to me. He put his hands up. He said he didn’t have any weapons, and he started to approach me. At that time, he appeared to be very nervous also....
(Emphasis added.)
¶ 70. And this was not Brandon Gales’s first meeting with the officer; Thomas testified at the suppression hearing that he had arrested Gales only “a week or two earlier” for “public profanity, something like that.” Moreover, Officer Thomas’s testimony regarding Gales’s behavior is not as unequivocal as the majority suggests. At the suppression hearing, Thomas testified that, “I thought I saw somebody running but I kept on driving so I turned back around and I slowed down, and that’s when I saw Brandon Gales. He was kind of trying to walk to try to play it off at that time like he wasn’t running.” (Emphasis added.) But Officer Thomas contradicted that statement at the suppression hearing by acknowledging that, in his report prepared at the time, he said only that Gales was walking. Even if Gales had been running, then stopped running when he noticed Officer Thomas, and this change of gait had “piqued” Thomas’s suspicions, one wonders why those suspicions were not dispelled by the striking differences between the suspect described *653 in the radio transmission and the way that Gales actually looked.
¶ 71. It cannot be said that these factors, taken together, “amount to reasonable suspicion.” U.S. v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Only Gales’s race and gender matched the description of the robbery suspect, and are thus the only characteristics warranting “suspicion” that are substantial in the transcript of the suppression hearing. The majority’s conclusion suggests that a Terry stop of any black male within approximately one mile of a crime scene would be justified. Consequently, I conclude that Officer Thomas’s initial stop of Gales was not justified by any “reasonable suspicion, grounded in specific and articu-lable facts.” Beyond mere speculation regarding Gales’s alleged conduct, Officer Thomas articulated no “unusual conduct” on the part of Gales which might have led “him reasonably to conclude in light of his experience that criminal activity may be afoot” and that Gales “may [have] be[en] armed and presently dangerous.” Terry, 892 U.S. at 30, 88 S.Ct. 1868. This simply is not a Terry case, and the stop was thus invalid from its outset. Gales’s concession that the police had a right to stop him and pat him down for weapons was mistaken and is of no legal significance.
2. Gales’s continued detention far exceeded the permissible scope of a Terry stop.
¶ 72. The majority concedes that “Officer Thomas’s continued detention of Gales and Officer Arendale’s conduct in taking Gales’s money are not congruent with Terry” and that “[t]he officers had ample time to attain a search warrant, which would have decisively made Officer Aren-dale’s actions proper.” I agree that this, standing alone, is an accurate statement. But, as an initial matter, the majority fails specifically and sufficiently to identify the authority under which the police justified a continued detention of Gales, although it does attempt to answer this inquiry by noting that “Gales no longer had a ‘reasonable expectation of privacy’ after he voluntarily showed Officer Thomas his money.” (citing Katz v. U.S., 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) (Harlan, J., concurring). I disagree. Powerful thing that it is, cash is not a weapon as contemplated by Terry. See Terry, 392 U.S. at 29, 30, 88 S.Ct. 1868.
¶ 73. The majority’s reliance on Justice Harlan’s concurrence in Katz is misplaced. In that case, the FBI, having obtained no warrant, utilized an “electronic listening and recording device” to eavesdrop on the conversations the defendant was having over the telephone in a public, but enclosed, telephone booth. Katz, 389 U.S. at 349, 88 S.Ct. 507. The majority of the United States Supreme Court reversed Katz’s conviction, holding that, “[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures.” Id. at 359, 88 S.Ct. 507. Katz is inapposite from the present ease, which does not involve a reasonable expectation of privacy in a constitutionally protected area, such as a “home, an office, or a hotel room” or “a telephone booth.” Katz certainly does not provide justification for the continued detention of Gales following his illegal arrest.
¶ 74. Illinois v. Andreas, also cited by the majority as support for its argument that Gales’s privacy interest in the cash was extinguished when he showed it to Officer Thomas, provides that “[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal.” Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (empha *654 sis added). In this case, Gales was not in possession of anything that had been identified as contraband. Rather, he merely was in possession of nondescript cash, not specifically identifiable at the time the police observed it as the cash stolen from the Hyatt Food Mart. The mere fact that Gales may have brought some cash into plain view did not extinguish his reasonable expectation of privacy in the unique features of the particular cash in his pocket, later brought to light when Gales was searched. Thus, the officers were not justified in examining the cash, as Gales lost no privacy interest in what from all appearances was a legal item.
¶ 75. Even if Gales had lost his reasonable expectation of privacy in the money by showing it to Officer Thomas, loss of a reasonable expectation of privacy in some currency does not justify continued detention of a suspect absent legitimate authority for so doing, e.g., probable cause to arrest.- Here, the police drove Gales to the scene of a crime, where Weber claimed to recognize a bill marked with some sort of ill-defined red stamp. The majority implicitly takes the position that this event validated the otherwise-deficient arrest of Gales.
¶ 76. Once the ostensible Terry stop— which never should have occurred in the first place-had revealed that Gales was in possession of no weapons, he should have been free to leave police custody. This Court has held unequivocally that “[a]n investigative stop must be limited in scope.... Where a detention ... exceeds the scope' of an investigative stop, it approaches a seizure. To justify a search and seizure without a warrant, the state must show probable cause for arrest.” Floyd v. State, 500 So.2d 989, 992 (Miss.1987) (quoting McCray v. State, 486 So.2d 1247, 1250 (Miss.l986)).The patent illegality of Gales’s continued detention, far in excess of the permissible scope of a genuine Terry stop, mandates exclusion of the evidence obtained thereby. See Terry, 392 U.S. at 29, 88 S.Ct. 1868 (“The sole justification of the search ... is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.”)
¶ 77. Regardless of whether Gales had a reasonable expectation of privacy in the cash that was in his pocket, the majority implicitly holds here that, because the cash found on Gales was believed to be evidence of an armed robbery, the detention, although unlawful from its inception, was made legitimate by Weber’s rather tenuous identification of one of the bills in Gales’s pocket as part of the loot from the robbery. Such a rule would turn the exclusionary rule on its head, rendering it wholly impotent. The majority’s acquiescence in this retroactive legitimation of illegal police conduct strips the Fourth Amendment of its purpose and its power. Indeed, the United States Supreme Court flatly has rejected the notion “that a search unlawful at its inception may be validated by what it turns up.” Wong Sun v. U.S., 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citing Byars v. U.S., 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); U.S. v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948)). Here, the fact that the cash'found on Gales may have been evidence of the armed robbery simply does not justify or legitimize his wrongful apprehension, his continued detention, and the search which led to a police belief that the cash in Gales’s possession was, indeed, the cash stolen from the Hyatt Food Mart. As in Wong Sun, “[a] contrary holding here would mean, that a vague suspicion could be transformed into probable cause for arrest by *655 reason of ambiguous conduct which the arresting officers themselves have provoked.” Wong Sun, 371 U.S. at 484, 88 S.Ct. 407. Here, after arresting Gales with no reasonable, suspicion for so doing, Officer Thomas prompted him to remove what was in his pocket. Even if, as the majority insists, Gales removed the cash of his own volition, its production was the direct result of an illegal arrest, and the fruit thus harvested must therefore be suppressed.
3. No probable cause justified Gales’s arrest.
¶78. The majority finds that, “[w]hen Officer Thomas handcuffed Gales, placed him into his cruiser, and transported him to another location, Gales was ‘effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that a ‘reasonable person would have believed he was not free to leave.’ ’ ” (quoting Florida v. Royer, 460 U.S. 491, 501-02,103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (quoting U.S. v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980))). I wholeheartedly agree with the majority that “[bjeeause [Gales’s] detainment would qualify as a Fourth Amendment seizure, the arresting officers were required to either attain a search warrant or to find an applicable exception to the warrant requirement in order to search Gales.”
¶ 79. The majority is mistaken in holding that the totality of the present circumstances provides “more than enough information for a reasonable person to ascertain a fair probability that Gales had just committed the crime in question.” The majority finds that probable cause justified Officer Thomas’s arrest of Gales because, “[w]hile the initial description of the suspect was inaccurate, Officer Thomas noticed a suspicious individual running away from the Hyatt Food Mart.” (Emphasis added.) That Gales was not running toward the Hyatt Food Mart does not necessarily mean that he was running “away” from it. The majority’s choice of words implies that Officer Thomas observed Gales actually fleeing the scene. This is wholly unsubstantiated in the record of the suppression hearing, since it is undisputed that Gales was at least five city blocks away from the Hyatt Food Mart at the time of his being arrested by Thomas. Further, the majority states that “Officer Thomas saw that the man began walking upon noticing police presence.” With respect, this statement is not supported in the record of the suppression hearing. Thomas equivocated: “I thought I saw somebody running but I kept on driving so I turned back around and I slowed down, and that’s when I saw Brandon Gales. He was kind of trying to walk to try to play it off at that time like he wasn’t running.” On cross examination, however, Officer Thomas acknowledged that, in his written report prepared at the time, he had said that Gales was walking.
¶ 80. Struggling to support its contention that Officer Thomas had probable cause to arrest Gales, the majority says, “Officer Thomas noticed that he was sweating, appeared nervous, and was wearing light clothing on a cold December night.” No evidence was adduced, either at the suppression hearing or at trial, regarding specifically how cold it was that night. Officer Thomas testified that Gales was wearing a “gray thermal-type shirt, long sleeve,” at the time he was apprehended. The majority continues that “Gales voluntarily showed Officer Thomas wads of money, which he claimed he had won gambling.” The colloquy between defense counsel and Officer Thomas at the suppression hearing reads as follows:
*656 Q: How was the money gotten out of his pants?
A: He pulled it out himself and said, “This money, I just left the gambling house.”
Q: Well, hold on, let’s think about this. You just told me he had a bulge in ■ his pockets and you wouldn’t reach in there and get it.
A: Right. Before I cuff him, he said, “All I got is this money from gambling,” and he showed me the money. I was like, “Okay, put it back in your pocket.” He put it back in his pocket, and then I detained him as a suspect because the money was balled up. It wasn’t like somebody had been gambling and would have folded it.
Q: Well, that depends. You say, “balled up.” In crap games, a lot of times you win a ten and five as you go, and you are grabbing it and balling it up, aren’t you? ■
A: I don’t know, I don’t gamble.
Q: Okay, then you really wouldn’t know how the money was supposed to be, would you? All right, you determined he had money on him, right?
A: At that time, yes.
¶ 81. The majority states that “Officer Thomas then asked his dispatcher to repeat the description of the suspect.' Dispatch then had a more detailed description of the suspect, describing an individual wearing a black hoodie, light blue jeans, and brown casual shoes.”- But the record of the suppression hearing substantiates only that a subsequent description identified the suspect as wearing blue jeans. Officer Thomas testified that an updated description “said that they were blue jeans once I had the suspect in custody.” The majority recognizes that Gales did not have on a black hoodie. But when asked by defense counsel at what point “were you advised or did you learn that brown shoes were involved,” Officer Thomas answered “I can’t recall.” When asked whether he learned of the brown shoes at the scene of the crime, Officer Thomas replied, “[mjaybe.” On redirect, Officer Thomas testified that Officer Jenkins later confirmed that Gales was the suspect because “that’s the pants and that’s the shoes that the guy had on.”
¶ 82. Although, as observed by the majority, the standard for probable cause is less than “proof beyond a reasonable doubt” or “preponderance of the evidence,” Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), some concreteness and particularity are nevertheless required. See Roach v. State, 7 So.3d 911, 917 (2009) (“probable cause exists when the facts and circumstances within an officer’s knowledge are ‘sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.’”) (quoting State v. Woods, 866 So.2d 422, 426 (Miss.2003) (quoting Strode v. State, 231 So.2d 779, 782 (Miss.1970))). The United States Supreme Court has held that “ ‘[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.’ ” Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting Brinegar v. U.S., 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Indeed, “[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide “whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to’ probable cause.” Pringle, 540 U.S. at 371, 124 S.Ct. 795 (quoting Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
*657 ¶ 83. Mere speculation on the part of Officer Thomas failed to provide him probable cause to arrest Gales, since none of the information Officer Thomas had at that point in time connected Gales with the crime in question. Cf. Pringle, 540 U.S. at 371, 124 S.Ct. 795 (“a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine,” where “[f]ive glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men,” occupants of the car.) I agree with the majority that Gales was arrested when Officer Thomas handcuffed him. But, despite the fact that the arrest was effected then, it was an invalid arrest, as no probable cause for an arrest existed and Thomas had no warrant. Officer Thomas’s testimony at the suppression hearing regarding Gales’s actions, his appearance, and his demeanor was contradictory and inconsistent. Gales was at least five blocks away from the scene of the crime and his attire matched an updated description of the suspect in only one particular, his blue jeans, an extremely common item of clothing. It was only after Gales had been arrested that the shoes the suspect had been wearing were identified as being similar to those Gales was wearing. Moreover, the mere fact that Gales had nondescript cash in his possession and that it was balled up in wads was not, in itself, enough for a reasonable officer to connect him to a particular criminal act.
4. Gales’s arrest does not qualify as a search incident to arrest.
¶ 84. Additionally, the majority makes a quantum leap to arrive at its characterization of Gales’s detention as a search incident to a lawful arrest. The United States Supreme Court held that, “[u]nder Chimel [v. California ], police may search incident to arrest only the space within an arres-tee’s ‘immediate control,’ meaning ‘the area from within which he might gain possession of a weapon or destructible evidence.’ ” Arizona v. Gant, 556 U.S. 332, 335,129 S.Ct. 1710,173 L.Ed.2d 485 (2009) (quoting Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (overruled on other grounds)). Gant limited the scope of Chimel to “reaching distance,” and the Supreme Court held that, because Gant was handcuffed and secured at the time his car was searched, he “clearly was not within reaching distance of his car at the time of the search.” Id. at 344, 129 S.Ct. 1710. In the present case, the officer handcuffed Gales, put him into the patrol car, drove him to the scene of the crime, and there searched him.[4] But, as in Gant, Gales was secured' at the time the search occurred and prior to the search, fully ameliorating any concerns over police safety. The search-incident-to-arrest exception to the warrant requirement is thus inapposite from the present circumstances, since “possession of a weapon or destructible evidence” was a practical impossibility for Gales while he was in police custody and handcuffed.
¶85. The majority also erroneously suggests that the present search qualifies as a search incident to arrest because it was “substantially contemporaneous with the arrest” and “Officer Thomas arrested Gales and immediately brought him to the crime scene.” The United States Supreme Court has held, however, that:
*658 The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime — things which might easily happen where the weapon or evidence is on the accused’s person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.
Preston v. U.S., 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) (emphasis added) (citing Agnello v. U.S., 269 U.S. 20, 31, 46 S.Ct. 4, 70 L.Ed. 145 (1925)). The Court there held that a search was unreasonable because it was “too remote in time or place to have been made as incidental to the arrest.” Id. at 368, 84 S.Ct. 881. In the present case, a warrantless search was made at the scene of the crime after Gales had been arrested, placed in police custody, and transported across the city. The search of Gales, as in Preston, “is simply not incident to the arrest.” Id. at 367, 84 S.Ct. 881.
5. The trial court committed reversible error by failing to grant Gales the motion to suppress to which he was entitled.
¶ 86. Here, the police per se violated Gales’s rights by apprehending him in the absence of reasonable suspicion, by arresting him in the absence of probable cause, and by hauling him to the scene of the crime to be searched in the absence of any legal authority for so doing. Consequently, the evidence obtained as the fruit of this unlawful detention ought to have been excluded. The United States Supreme Court has held that “[w]e need not hold that all evidence is ‘fruit of the poisonous tree’ simply because it would not have come to light but for the illegal actions of the police.” Wong Sun, 371 U.S. at 487-88, 83 S.Ct. 407. “Rather, the more apt question in such a case is ‘whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ ” Id. at 488, 83 S.Ct. 407 (citing Maguire, Evidence of Guilt, 221 (1959)). In that case, the police, upon hearing that one “Blackie Toy” sold an ounce of heroin to an informant, arrested a James Wah Toy in the absence of any probable cause that he was the same person sought in the investigation. Wong Sun, 371 U.S. at 481, 83 S.Ct. 407. The Supreme Court excluded the narcotics obtained through an illegal arrest because they “were ‘come at by the exploitation of that illegality.’ ” Id. at 488, 83 S.Ct. 407. Here, as in Wong Sun, the proper remedy is exclusion, since the cash obtained and identified was “come at by exploitation of’ the illegality. No mitigating feature serves to purge the primary taint of the illegality of the initial stop, the continued detention, and the search.
¶ 87. Likewise, this Court has held that suppression was the appropriate remedy where no “reasonable grounds” justified “the investigatory stop and subsequent search and seizure of evidence from Eaddy.” Eaddy, 63 So.3d at 1216. There, police stopped Eaddy’s vehicle based on the tip of an informant that a different individual for whom the police had an arrest warrant was in town. Id. at 1212. Upon approaching the car, the officer “saw the butt of a gun under the driver’s seat, smelled alcohol, and saw an empty liquor bottle.” Id. A pat-down search of Eaddy revealed “two pill bottles that each ap *659 peared to hold cocaine.” Id. Suppression was the appropriate remedy because the initial apprehension was invalid at inception and the police lacked “reasonable suspicion to make an investigatory stop.” Id. at 1214. In the present case, the initial stop of Gales was invalid because it was not based on reasonable suspicion. The cash in Gales’s possession', obtained as fruit of an illegal arrest, should not have been used against him at trial. As in Eaddy, the motion to suppress should have ■ been granted.
6. Conclusion
¶ 88. Officer Thomas articulated no reasonable suspicion to justify his initial apprehension of Gales. Gales’s continued detention and subsequent search had no basis in law and constituted precisely the sort of unreasonable conduct on the part of the government which is precluded by the Fourth Amendment to the United States Constitution and Article -3, Section 23, of the Mississippi Constitution. I would reverse and remand for a new trial, absent the fruit of the illegal arrest.
KING, J., JOINS THIS OPINION.

. At one point in its opinion, the majority states that "Gales voluntarily got out of the police cruiser when brought to the crime scene.” Considering that Gales was shackled at the time, the assertion that his exit from the police cruiser was voluntary strains credulity. Further, Investigator Arendale testified at the suppression hearing that he pulled Gales out of the police cruiser.