DICKINSON, Presiding Justice,
dissenting:
¶ 26. This ease presents a troubling issue that both the majority and concurring justices skillfully avoid by reaching back to a civil-rights-era statute that was never argued to the trial judge, and that they presume empowers the police — even when they lack probable cause or reasonable suspicion — to order citizens to obey their commands, and to arrest them for “disorderly conduct” when they refuse.
¶ 27. According to the majority, a citizen standing on a public sidewalk who is committing no crime, who has committed no crime and who is not even suspected of having committed a crime may properly be arrested for “disorderly conduct ” for refusing to put his hands on a car to be searched by a police officer who admits he has no probable cause or reasonable suspicion to conduct the search.
¶ 28. And what is worse, for the majority to say that S.S. resisted arrest when he was being arrested for “disorderly conduct” stretches the outer bounds of any credible interpretation of the facts before us. The petition — the Youth Court’s version of an indictment — makes no mention of “disorderly conduct.” During the entire hearing before the Youth Court, the prosecutor never mentioned or argued “disorderly conduct,” let alone proved it. Defense counsel had no reason ’ to defend against “disorderly conduct” because it was neither mentioned in the petition nor raised by the prosecutor. And perhaps most importantly, the police officer who arrested S.S. never mentioned “disorderly conduct” and provided no testimony whatsoever about attempting to arrest S.S. for “disorderly conduct.”
¶ 29. But my concern goes far beyond the question of whether the State argued “disorderly conduct.” My fear is this Court’s casual, pervasive grant of power to the police to arrest citizens who have done nothing wrong and who are not suspected of having done anything wrong, simply because they do not agree to put their hands on a car to be searched.
¶ 30. I want to be very clear: Had Officer Kent testified that he was reasonably concerned that S.S. might have a weapon, I would not be writing this dissent. Had he testified that he reasonably suspected that S.S. was the one who fired the gun, I would not be writing this dissent. But Officer Kent testified his “concern wasn’t with S.S.” and he “did not think [S.S.] had shot the weapon.”
¶ 31. Did Officer Kent have a right to order S.S. to put his hands on the car? Not even the majority claims he did. The majority recognizes Officer Kent had no probable cause or reasonable suspicion concerning S.S. The majority says S.S. committed disorderly conduct, not for refusing to put his hands on the car, but because his refusal was likely to lead to a breach of the peace. This is an interesting conclusion by the majority, given that nothing even close to this argument was made by the prosecutor, or by Officer Kent.
*755 ¶ 32. As S.S. stated in his brief, “[t]he prosecution’s witnesses and the petition itself fail to point to a specific criminal act giving rise to the arrest that S.S. allegedly resisted.... ” This alone is reason enough to reverse this case. But I would reverse it for the additional reason that police officers who lack any probable cause or reasonable suspicion concerning a citizen have no right to order that citizen to put their hands on a car to be searched. And I am astonished that a majority of this Court believes otherwise. For these reasons, I respectfully dissent.
BACKGROUND FACTS
¶ 33. Thirteen-year-old S.S., who had done nothing wrong, stood on a public sidewalk near a parked car that fit the general description of a car from which a gunshot reportedly had been fired at another location. Investigating Officer Ben Kent spotted the unoccupied car parked near an apartment complex. Several other persons, including males — one of the males was S.S.’s older brother, D.S. — females, and children, were standing in a nearby yard. Officer Kent got out of his patrol car, drew his pistol, and approached the scene. He testified about the moments that followed:
Q. Officer, did you know both D.S. and S.S., you knew who they were?
A. I had never dealt with them personally. Some officers in the past had some dealings with them and gave me some information about where they stayed and the vehicle they were driving.
Q. Did you know who they were when you saw them when you drove up?
A. No, sir. I did not, not at the time.
¶ 34. In the Juvenile Detention Report, Officer Kent stated:
There were several people outside, so I drew my pistol and told all the males by the car to place their hands on the car so I could pat them down for weapons.
At this juncture, as Officer Kent approached with his pistol and began to order S.S. to show his hands and put his hands on the car, there is not a scrap of evidence to indicate that the men, women, and children who stood in the yard talking presented any threat of any kind.
¶ 35. Next, according to the Youth Court Petition, S.S. “resisted his lawful arrest by [Officer Kent] by refusing to put his hands on the car and struggling with the officers.” When Officer Kent was later asked what S.S. had done to “resist,” he replied: “Well, he just would not put his hands behind his back, struggling.”
¶ 36. Ordinarily, when a person resists arrest for some crime — say, assault — the person is indicted and prosecuted for both assault and resisting, arrest. That did not happen here. Officer Kent’s testimony clearly established that at no point did he ever suspect S.S. of having any involvement in the crime being investigated. In fact, Officer Kent testified that as he approached — with his weapon drawn — his “concern wasn’t with S.S.” and he “did not think [S.S.] had shot the weapon.”
¶ 37. Prior to Officer Kent’s move to arrest S.S., there is no evidence whatsoever that S.S. did anything other than say, “I’m not putting my hands on the car.” For that, the Youth Court adjudicated him a delinquent. It is from that adjudication that S.S. appeals.
ANALYSIS
¶ 38. The key issue is whether S.S. committed disorderly conduct. If he did not, then Officer Kent’s attempt to arrest *756 S.S. was unlawful.[4] And at least in theory, citizens have the right to resist an unlawful arrest.[5]

■Arrest must be lawful

¶ 39. Police officers have no power to exercise any authority over citizens except the powers specifically granted by the statutes and ordinances that control their respective jurisdictions. And where a police officer without probable cause attempts to exercise the power to arrest, a citizen is justified in resisting that arrest.[6] The statute that criminalizes resisting arrest— Section 97-9-73 — states:
It shall be unlawful for any person to obstruct or resist by force, or violence, or threats, or in any other manner, his lawful arrest or the lawful arrest of another person by any state, local or federal law enforcement officer, and any person or persons so doing shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than Five Hundred Dollars ($500.00), or by imprisonment in the county jail not more than six (6) months, or both.[7]
This statute clearly and specifically restricts its reach to lawful arrests. Prior to today’s case, no statute criminalized resisting an unlawful arrest. Apparently, “disorderly conduct” now is an exception.

Disorderly conduct

¶40. The majority claims that S.S. committed the crime of disorderly conduct. The Mississippi Legislature enacted the disorderly conduct statute in 1964, during the Civil Rights movement’s sit-ins, protests, marches, and other acts of civil disobedience.[8] Armed with the power of this new statute, police officers could arrest not only the protester or sit-in participant, but everyone else who refused to do whatever the officer ordered them to do during the course of the arrest. Specifically, the disorderly conduct statute states:
(1) Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law....[9]
The statute clearly does not come into play unless a law enforcement officer has “the authority to then and there arrest any person for a violation of the law.” The phrase “then and there” is not to be found in the- majority opinion, and understandably so, because Officer Kent had no authority “then and there” to arrest S.S. or anybody else.
¶ 41. I believe that the phrase “having the authority to then and there arrest any person for a violation of the law ” means an officer must have authority — at the particular time and place he gives the order— to arrest some particular person; and the authority to arrest requires probable *757 cause. The arguments in favor of this interpretation are many.
¶42. First, no constitutional provision or statute grants police officers unbridled authority to make arrests. And no citation of authority is necessary for the universally accepted proposition that police officers are not authorized to arrest anyone without observing the crime or. possessing probable cause that the person committed a crime.
¶43. Also, and perhaps most importantly, this Court has expressed a view consistent with mine in numerous cases. For instance, this Court has said that if a police officer:
does not have authority to make an arrest at the instant he begins his pursuit for that purpose, the fact that the person the officer is pursuing violates in [sic] a traffic law in making his escape does not thereby authorize the arrest which began unlawfully.[10]
If a police officer always has authority to make arrests within the officer’s jurisdiction, this language makes little sense.
¶ 44. In another case, this Court held:
The authority of the arresting officer in the instant case cannot be denied. It is undisputed that he was a peace officer and as such he had authority under [statute omitted] to make an arrest without a warrant if a felony had in fact been committed and he had reasonable cause to believe that defendant had committed it.[11]
The Nash Court’s use of the word “if” as a qualifier to the officer’s authority makes it even more clear that officers do not have authority to make arrests without probable cause.
¶ 45. And in still another case, this Court stated:
It has been universally recognized as a rule of law in the United States that a police officer is authorized to arrest a person without a warrant where the officer has reasonable cause to believe a felony has been committed and that the person proposed to be arrested is the one who committed it.[12]
¶46. These cases, and numerous others, clearly set forth the proposition that a police officer’s “authority to then and there arrest any person for a violation of the law” is limited to those instances where the officer has probable cause to arrest some person.
¶ 47. But there is a more compelling reason supporting my interpretation. Because both police officers and citizens alike have the general right to make arrests at any time or place, why would the “disorderly conduct” statute include the limiting language? Section 99-3-1 empowers police officers and citizens alike to make arrests.[13] Section 99-3-3 says arrests “may be made at any time or place.”[14] Clearly, the “disorderly conduct” statute granted police officers the power to give orders — and to arrest those who disobeyed those orders — during the course of a specific arrest.
*758 ¶ 48. At the very least, the interpretation of the “disorderly conduct” statute requiring the police officer to have probable cause to then and there arrest some particular person is in concert with numerous previous opinions from this Court and certainly is a reasonable interpretation. Thus, it should trump a different interpretation that is less favorable to a criminal accused. The majority provides no explanation why it fails to do so.
¶ 49. The majority’s description of the duplex yard as a “chaotic scene” conjures up visions of a crime scene fraught with danger, where menacing thugs milled around, shouting threats, brandishing knives and guns, and committing violent acts. But the facts in the record conclusively establish that Officer Kent voluntarily drove to a place where he had no reason to believe any crime had been committed. When he arrived (before the other police officers), he found a thirteen-year-old kid and some people standing in a yard, including women and children. There is nothing to suggest anyone was breaching the peace. There was no gun, knife, threat, or aggressive behavior of any kind on the part of anyone present, prior to Officer Kent pulling his gun and ordering S.S. to place his hands on the car.
¶ 50. The majority cites testimony by officers who arrived after Officer Kent had pulled the gun and ordered S.S. to place his hands on the car. Certainly, Officer Kent’s own actions do not justify charging S.S. with “disorderly conduct.” And it is noteworthy that Officer Kent’s appreciation of, or concern for, any danger was not such that he waited in his patrol car for back-up officers to arrive.
¶ 51. Here, we must simply ask who Officer Kent had probable cause “to then and there” arrest when S.S. “fail[ed] or refusefd] to promptly comply with or obey [his] request, command, or order.” The answer is that he had no probable cause to arrest anyone. The record lacks any evidence that Officer Kent already possessed probable cause to arrest anyone present when he drew his pistol and ordered S.S. to show his hands and put his hands on the car. Officer Kent’s only reason for going to the duplex on Cleveland Street instead of the location of the shooting was that he knew a car similar to the description often parked there.
¶ 52. The State presented no evidence that Officer Kent had information to connect any particular person present on Cleveland Street to the shooting or any other crime. Because the authority to arrest depends on the existence of probable cause, the State failed show that when Officer Kent ordered S.S. to put his hands on the car, he had the “authority to then and there arrest any person.”
¶ 53. It is a sobering and frightening suggestion that, just because police officers are generally authorized to make arrests, they have the power to order citizens to do whatever the officers want them to do, and that a citizen’s failure to comply with the officer’s orders — no matter how unreasonable — should be made a crime, even though the officer had no probable cause to arrest anyone, and not even sufficient reasonable suspicion to make an investigatory stop and search.
¶ 54. If the law is to be as the majority suggests today, then the following decades-old quote from Williamson v. State has no meaning at all:
An investigatory stop may be made even where officials have no probable cause to make an arrest as long as they have “reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony ... or ‘some objective manifestation that the person stopped is, or is *759 about to be engaged in criminal activity.’ ”[15]
Applying the majority’s interpretation of the disorderly conduct statute, I see little need for police officers to worry too much about the technicalities of reasonable suspicion, articulable facts, or probable cause. A savvy police officer need only give a person a few orders (“put your hands on the car” or “get off that sidewalk,” etc.) and as soon as the person fails to comply with one of the orders, the officer may skip the Terry stop and proceed directly to an arrest for disorderly conduct. And if the person resists, the officer may add the charge of resisting arrest and then, as here, abandon the arrest for disorderly conduct.
¶ 55. The majority stands untroubled by this danger because it assumes citizens are sufficiently protected by the statute’s requirement of a finding that the refusal to obey the officer’s order must demonstrate “intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace.” What protection did that requirement provide S.S.? He did nothing but say seven words: “I’m not putting my hands on the car.” I remind the reader that S.S. was a thirteen-year-old kid, standing on a public sidewalk, who had done nothing wrong. And knowing he had done nothing wrong, he simply refused to place his hands on a car. If the trial court can find that this simple refusal amounted to S.S.’s intent to breach the peace, than what would not? The majority’s perceived protection is no protection at all.
CONCLUSION
¶ 56. To conclude this doomed effort to ignite some interest in the constitutional protections being trampled today, I recite the following from the United States Supreme Court’s opinion in Terry v. Ohio:
[Cjourts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.[16]
The issue here is not whether at some point Officer Kent might have developed the right to frisk S.S. Rather, the issue is whether Officer Kent had probable cause to arrest S.S., or anyone else present, when he ordered S.S. to place his hands on the car. Because he did not, Officer Kent had no authority to arrest S.S. for disorderly conduct, and S.S. had every right to resist that arrest. And because the State presented insufficient evidence to adjudicate S.S. a delinquent for resisting a lawful arrest, I respectfully disagree with the views expressed by the majority and hereby dissent.
KITCHENS, CHANDLER AND KING, JJ., JOIN THIS OPINION.

. Williamson v. State, 876 So.2d 353, 355 (Miss.2004) (quoting Singletary v. State, 318 So.2d 873, 876 (Miss.1975)).

. This was the law before today’s case. After today, resisting an unlawful arrest may be relabeled "disorderly conduct.”

. Taylor v. State, 396 So.2d 39, 42 (Miss.1981) (quoting Smith v. State, 208 So.2d 746, 747 (Miss.1968) (citing Pettis v. State, 209 Miss. 726, 48 So.2d 355 (1950); Craft v. State, 202 Miss. 43, 30 So.2d 414 (1947))).

. Miss.Code Ann. § 97-9-73 (Rev. 2014) (emphasis added).

. Miss.Code Ann. § 97-35-7(1) (Rev. 2014).

. Id. (emphasis added).

. Terry v. State, 252 Miss. 479, 485, 173 So.2d 889 (1965) (emphasis added).

. Nash v. State, 207 So.2d 104 (Miss.1968) (emphasis added).

. Powe v. State, 235 So.2d 920, 922 (Miss.1970) (emphasis added).

.Miss.Code Ann. § 99-3-1 (Rev. 2007).

. Miss.Code Ann. § 99-3-3 (Rev. 2007). See Shinall v. State, 199 So.2d 251 (Miss.1967) (peace officers and citizens may make arrests at any time), ovemded on other grounds by Flowers v. State, 473 So.2d 164, 165-66 (Miss.1985).

. Williamson, 876 So.2d at 355 (emphasis added) (quoting Floyd v. State, 500 So.2d 989, 992 (Miss.1986) (quoting McCray v. State, 486 So.2d 1247, 1249-50 (Miss.1986))).

. Terry v. Ohio, 392 U.S. 1, 15, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added).